DAVID A. HUBBERT
Acting Assistant Attorney General

AMY MATCHISON (CA Bar No. 217022)
Trial Attorney
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:     (202) 307-6422
Fax:           (202) 307-0054
E-mail: Amy.T.Matchison@usdoj.gov
        Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE TAX LIABILITIES OF:<br><br>JOHN DOES, United States person(s), who directly or indirectly had authority over any combination of accounts held with Payward Ventures Inc., d/b/a Kraken or Kraken.com, or its predecessors, subsidiaries, divisions, or affiliates (collectively, "Kraken"), with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the period January 1, 2016 through December 31, 2020. | Civil Number:<br><br>**DECLARATION OF KAREN CINCOTTA IN SUPPORT OF EX PARTE PETITION FOR LEAVE TO SERVE "JOHN DOE" SUMMONS** |

I, Karen Cincotta, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a duly commissioned Internal Revenue Agent ("Revenue Agent") assigned as a Supervisory Revenue Agent in the Internal Revenue Service's ("IRS") Offshore Compliance Initiative ("OCI").  OCI develops projects, methodologies, and techniques for identifying United States ("U.S.") taxpayers who are involved in abusive transactions and financial arrangements for tax-avoidance purposes.  Although OCI's work typically involves abusive offshore transactions and financial arrangements, the virtual currency issues I have been working on are not limited to offshore activities.

2.      I have been a Revenue Agent since 2005 and have specialized in offshore investigations since 2009.  As a Revenue Agent, I served as a Senior Revenue Agent in the Large Business and

International Division of the IRS beginning in July 2011 until I accepted my current position as a Supervisory Revenue Agent in November 2019.  My post of duty is in Laguna Niguel, California.

## I.     BACKGROUND

3.     The IRS is conducting an investigation to determine the identity and correct federal income tax liability of U.S. persons who conducted transactions in cryptocurrency for the years ended December 31, 2016, 2017, 2018, 2019, and 2020.

4.     As the organization responsible for enforcing and administering the internal revenue laws of the United States, the IRS, in recent years, has become aware of significant tax compliance issues relating to the use of virtual currencies, including cryptocurrencies, as detailed below.

### A.     Tax Compliance Concerns Associated With the Use of Virtual Currencies and the IRS's Compliance Initiative

5.     In 2013, at the request of the Senate Finance Committee, the Government Accountability Office ("GAO") completed a study of the use of virtual currency.  Through interviews with industry representatives, tax professionals, IRS officials, and academics, GAO identified several tax compliance risks associated with virtual currencies, ranging from lack of knowledge of tax requirements and uncertainty over how to report virtual currency transactions to deliberate underreporting of income and tax evasion.  *See* U.S. Gov't Accountability Office, GAO-13-516, Virtual Economies and Currencies: Additional IRS Guidance Could Reduce Tax Compliance Risks (2013) https://www.gao.gov/products/GAO-13-516 [https://perma.cc/H83E-BFSD].

6.     In September 2016, the Treasury Inspector General for Tax Administration ("TIGTA") issued a report explaining that taxpayers' use of virtual currencies, including cryptocurrencies, had expanded significantly in recent years.  *See* As the Use of Virtual Currencies in Taxable Transactions Becomes More Common, Additional Actions Are Needed to Ensure Taxpayer Compliance, Reference Number 2016-30-083 (Sept. 21, 2016) https://www.treasury.gov/tigta/auditreports/2016reports/201630083fr.pdf [https://perma.cc/5BW9-YXWT].  The report reflects TIGTA's independent determination that while there are legitimate reasons to use virtual currency – lower transaction fees and faster transfers of funds compared to traditional currencies – some virtual currencies are also popular because the identities of the parties involved are

Declaration of Karen Cincotta in Support of
Ex Parte Petition For Leave
to Serve "John Doe" Summons          2

generally anonymous, leading to a greater possibility of their use in illegal transactions.

7.      Since 2005, the IRS's Electronic Payment Systems Initiative ("EPSI") has focused on developing projects, methodologies, and techniques for identifying U.S. taxpayers who use electronic funds transfer and payment systems for tax avoidance purposes.  In September 2013, OCI expanded the scope of the EPSI to address U.S. taxpayers who use virtual currencies for tax avoidance purposes, recognizing that some U.S. taxpayers use such currencies to expatriate and repatriate funds to and from offshore accounts.

8.      In furtherance of the EPSI, the IRS is conducting an investigation to identify tax noncompliance related to the use of virtual currency.  In December 2013, the IRS established a Virtual Currency Issue Team ("VCIT").  The VCIT was established to study the issue and then consider the compliance impact related to virtual currencies.  The VCIT developed a three-pronged approach involving first learning about virtual currency, next educating the examination workforce regarding the issue, and then developing examination techniques to identify and address issues during an examination. This "John Doe" summons is one of the tools being used in the investigation.

9.      In June 2015, TIGTA contacted the IRS to gather information for a review of the IRS's compliance strategy for addressing the reporting of revenue and expenses occurring through the use of virtual currencies and other alternative payment methods.  At that time, the IRS shared information with TIGTA regarding the VCIT and EPSI.  In October 2015, TIGTA sent the IRS an engagement letter formally initiating its review.  In December 2015, the IRS advised TIGTA that it was working to further its virtual currency investigation.

10.     On November 30, 2016, the District Court for the Northern District of California authorized the IRS to serve a John Doe summons to Coinbase, Inc., a U.S. based digital currency exchange, to identify U.S. taxpayers who, at any time during the period from January 1, 2013 through December 31, 2015, conducted transactions in a convertible virtual currency as defined in IRS Notice 2014-21.  *See United States v. John Doe*, No. 3:16-cv-06658-JSC (N.D. Cal. Nov. 30, 2016) (Order (Doc. 7)).  Coinbase was served with the summons on December 8, 2016.  Coinbase did not comply with the summons.

Declaration of Karen Cincotta in Support of
Ex Parte Petition For Leave
to Serve "John Doe" Summons                    3

11.     On March 16, 2017, a petition to enforce the John Doe summons was filed against Coinbase in the District Court for the Northern District of California.  On November 29, 2017, the court granted the petition to enforce a narrowed John Doe summons.  *See United States v. Coinbase, Inc.*, No. 17-cv-01431-JSC (N.D. Cal. Nov. 29, 2017) (Judgment (Doc. 77)).  Coinbase was ordered to produce documents for accounts with at least the equivalent of $20,000 in any one transaction type (buy, sell, send, or receive) in any one year for the 2013 through 2015 tax years.

12.     Coinbase advised impacted account holders that it was required to disclose the information described in the enforcement order.  Coinbase's webpage states that, "On February 23rd, 2018, Coinbase notified a group of approximately 13,000 customers concerning a summons from the IRS regarding their Coinbase accounts."  Coinbase, https://help.coinbase.com/en/coinbase/taxes-reports-and-financial-services/taxes/irs-notification (September 21, 2020, 4:17 PM) [https://perma.cc/GL68-BSLM].

13.     On July 2, 2018, the IRS announced its Virtual Currency Compliance campaign directed at addressing "noncompliance related to the use of virtual currency through multiple treatment streams including outreach and examinations."  *See* IRS Announces the Identification and Selection of Five Large Business and International Compliance Campaigns, https://www.irs.gov/businesses/irs-announces-the-identification-and-selection-of-five-large-business-and-international-compliance-campaigns https://perma.cc/KU4F-VKMQ.

14.     Then, on July 26, 2019, the IRS announced that it began sending letters to virtual currency owners, advising them to pay back taxes and file amended returns.  By the end of August 2019, the IRS had issued more than 10,000 letters to taxpayers who owned virtual currency.  Following the issuance of the letters, additional taxpayers filed amended returns reporting virtual currency transactions that were not previously reported.

**B.     Cryptocurrency in General**

15.     Cryptocurrency is a particular type of virtual currency as the IRS has used that term in Notice 2014-21.  Cryptocurrency, however, can be further divided into two general categories – crypto-coins and crypto-tokens – although the two are often referred to generally as cryptocurrency.

Declaration of Karen Cincotta in Support of
Ex Parte Petition For Leave
to Serve "John Doe" Summons          4

16.     As of January 15, 2021, cryptocurrency tracking website www.coinmarketcap.com indicated that more than 8,000 separate cryptocurrencies existed.  The most widely known cryptocurrency, and largest by capitalization, is bitcoin.  Given bitcoin's prominence in the cryptocurrency ecosystem, other cryptocurrencies are often generically referred to as alternative coins or "altcoins" for short.  A few examples of altcoins are ethereum ("ether" or "ETH"), Litecoin ("LTC"), XRP ("ripple"), and stellar ("XLM").

17.     In general, cryptocurrency is based on distributed ledger (blockchain[1]) technology.[2]  In a distributed ledger technology system, a user creates a cryptocurrency wallet to engage in cryptocurrency transactions.  A wallet is a computer file that contains information (software and protocols) used in transferring units of a cryptocurrency.  When the wallet is downloaded or purchased (as in the case of a hardware wallet), the user prompts software in the wallet to generate a private key.  The private key is then used to generate a public key, which, in turn, is used to generate an address.  The private key, public key, and address are linked, but the particular encryption protocols employed to create the public key and address are only one-way, which prevents the reverse engineering of the private key from the address or public key.[3]

18.     A wallet may hold any number of private/public key pairs.  Addresses and public keys are shared with other users in order to conduct cryptocurrency transactions.  Private keys, which are used as the last piece in forming the digital signature to conduct a transaction, generally should not be

---

[1] While distributed ledger technology is commonly referred to as a "blockchain" this is not entirely accurate.  There are some types of distributed ledgers that do not use "blocks."  *See, e.g.*, https://www.iota.org/get-started/what-is-iota https://perma.cc/PN63-XNKZ (discussing IOTA distributed ledger's use of a "tangle" chain rather than conventional "block" chain).

[2] *See* Financial Action Task Force Report, *Virtual Currencies Key Definitions and Potential AML/CFT Risks,* June 2014, http://www.fatf-gafi.org/publications/methodsandtrends/documents/virtual-currency-definitions-aml-cft-risk.html [https://perma.cc/3W7X-R6TD]; *see also generally* Bitcoin, https://en.bitcoin.it/wiki/Main_Page [https://perma.cc/DZ44-XBZV].

[3] *See* https://www.mycryptopedia.com/public-key-private-key-explained/ https://perma.cc/QQE2-PG6F *see also* David W. Perkins, Cong. Research Serv., IF10824, *Financial Innovation: "Cryptocurrencies,"* (February 2018) https://crsreports.congress.gov/product/pdf/IF/IF10824 [https://perma.cc/6JAD-VSM7].

shared.  Sharing of a private key would permit another individual to engage in transactions on the

original user's behalf.[4]

19.    The method described above for transacting in cryptocurrency is generally the same

regardless of whether it is a crypto-coin or crypto-token.  There is a difference, however, in how those

two assets are created and how transactions for each are validated and tracked.

20.    Crypto-coins are created as a component of the distributed ledger itself.  As such, crypto-

coin transactions are confirmed by computer nodes participating in the maintenance of the distributed

ledger and those transactions are then recorded in blocks that make up the distributed ledger's

blockchain (assuming the crypto-coin uses a blockchain-type distributed ledger).

21.    Generally, all transactions on a crypto-coin blockchain can be viewed by the public on

any computer connected to the Internet.[5]  However, the blockchain transactional history generally only

reveals the date, time, units, address, wallet ID (to which the address belongs to), and transaction ID

associated with a transaction.  The blockchain does not identify the actual identities of the address and

wallet owners.

22.    Separately, crypto-tokens are not an inherent part of a distributed ledger.  Tokens, rather,

are created through particular computer scripts or programs such as smart contracts or decentralized

applications ("DApps") that are hosted by or built off of a distributed ledger.  For example, the

Ethereum blockchain is a distributed ledger platform that uses the crypto-coin ether.  *See generally*

Ethereum, https://ethereum.org/learn/ [https://perma.cc/MN7S-9ZW8].  The Ethereum blockchain,

however, is also designed to host crypto-tokens created through smart contracts or DApps built off of

the Ethereum blockchain.  *Id.*  The crypto-coin ether is designed to function as the "gas" (compensation)

for running the smart contracts and DApps on the Ethereum platform.  *Id.*

---

[4] *See* Coinbase, https://support.coinbase.com/customer/en/portal/articles/2275614-is-a-wallet-address-safe-to-display-publicly-?b_id=13521 [https://perma.cc/N8E7-5NFU].

[5] Not all crypto-coins operate this way.  Some are designed specifically to protect all transactional information or at least to provide users the option to do so.  *See e.g.*, https://web.getmonero.org/get-started/what-is-monero/ [https://perma.cc/46KZ-NDJ4]; https://docs.dash.org/en/stable/introduction/features.html#privatesend [https://perma.cc/T6X7-5GH4].

23.     As with crypto-coins, crypto-tokens can be transferred using a cryptocurrency wallet.

24.     The peer-to-peer nature of cryptocurrencies, compounded by the pseudo-anonymous nature of publicly-available-transactional information, makes the examination of an individual's cryptocurrency transactions for tax purposes – particularly, the receipt of income or investment gains – more difficult than examinations involving traditional transactions conducted through regular banking or financial institutions.

25.     In order to buy cryptocurrency (coins or tokens), a user must transfer traditional (fiat) currency to someone who already has cryptocurrency and wishes to exchange it for traditional currency. This exchange can occur directly with anyone holding cryptocurrency, but also can be handled through businesses known as digital currency exchanges.  Such businesses (like Kraken discussed below), trade between cryptocurrencies and traditional currencies or sometimes just between different cryptocurrencies (coins and/or tokens).

26.     A digital currency exchange functions much like a traditional currency exchange, except it deals with the conversion of cryptocurrency for traditional currency or vice versa, as well as the exchange of one cryptocurrency for another cryptocurrency.  Digital currency exchanges may also provide wallet services.  These hosted wallet services allow a user to quickly authorize cryptocurrency transactions with another user through the use of a user account held at the exchange.  Hosted wallet accounts are accessible through a computer or mobile device like a smartphone.[6]

27.     Digital currency exchanges are generally regulated as "money transmitters" (a type of money services business) under Title 31 of the United States Code ("U.S.C.").  *See generally* FinCEN Guidance No. FIN-2013-G001: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013) https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf [https://perma.cc/E9C8-YH3C]; FinCEN Guidance No. FIN-2019-G001: Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies (May 9, 2019)

---

[6] *See* Edward V. Murphy, M. Maureen Murphy, Michael V. Seitzinger, Cong. Research Serv., R43339, *Bitcoin: Questions, Answers, and Analysis of Legal Issues* (October 2015) https://crsreports.congress.gov/product/pdf/R/R43339 [https://perma.cc/V5QH-VFWW].

1  https://www.fincen.gov/sites/default/files/2019-
2  05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf [https://perma.cc/6BVK-AJVP].

3      28.    As a money transmitter, digital currency exchanges are required to obtain and maintain
4  certain customer identification information and transactional data for the purpose of combating illicit
5  activity such as money laundering, tax evasion, and terrorism financing.  *See* 31 U.S.C. § 5311; 31
6  C.F.R. § 1010.100(ff)(5), § 1022.210; FinCEN Guidance No. FIN-2019-A003: Advisory on Illicit
7  Activity Involving Convertible Virtual Currency (May 9, 2019),
8  https://www.fincen.gov/sites/default/files/advisory/2019-05-
9  10/FinCEN%20Advisory%20CVC%20FINAL%20508.pdf [https://perma.cc/3MCL-5YQ9].

10      29.    With respect to cryptocurrencies, digital currency exchanges (such as Kraken discussed
11  below), provide valuable information about an individual customer's cryptocurrency transactions that
12  can be used in conjunction with other publicly available blockchain information to adequately examine
13  whether an individual has complied with internal revenue laws.

14      30.    As detailed below, the IRS is pursuing this John Doe summons to Kraken in order to
15  obtain customer and transactional information belonging to members of the John Doe class that can be
16  used to conduct examinations of persons that may not have complied with the internal revenue laws.

17      **C.**    **Taxation of Virtual Currency**

18      31.    Virtual currency, including cryptocurrency, is treated as property for tax purposes.  *See*
19  *generally* Notice 2014-21.  The following examples provide an overview of how tax principles
20  applicable to transactions in property apply to transactions in virtual currency:

21      •    Wages, salary, or other income paid to an employee with virtual currency is
22  reportable by the employee as ordinary income and subject to employment taxes
23  paid by the employer.

24      •    Virtual currency received by a self-employed individual in exchange for goods or
25  services is reportable as ordinary income and is subject to self-employment tax.
26  This would include a person who "mines" virtual currency as a trade or business.

27

Declaration of Karen Cincotta in Support of
Ex Parte Petition For Leave
to Serve "John Doe" Summons    8

- Virtual currency received in exchange for goods or services by a business is reportable as ordinary income.

- Gain on the exchange of virtual currency for other property is generally reportable as a capital gain if the virtual currency was held as a capital asset and as ordinary income if it is property held for sale to customers in a trade or business.

- Gain on the sale of property held as a capital asset in exchange for virtual currency is reportable as a capital gain.

- Payments made in virtual currency are subject to information reporting requirements to the same extent as payments made in fiat currency or instruments denominated in fiat currency.

32.     Users of digital currency exchanges, such as Kraken, may engage in taxable transactions through the receipt of cryptocurrency into the user's digital currency exchange account as payment for goods or services, or through the buying and selling of cryptocurrency through the user's digital currency exchange account.

**D.     The IRS's Experience with Tax Non-Compliance**

33.     As noted above, both GAO and TIGTA have raised concerns about tax compliance issues relating to virtual currency.  And, as discussed above, the IRS has initiated specific programs and campaigns to address compliance issues through both taxpayer education as well as enforcement.

34.     Some taxpayers may deliberately use cryptocurrencies to evade taxes.  Certain taxpayers have openly acknowledged their plans to violate internal revenue laws by intentionally not reporting income from the use of cryptocurrency.  See *36% of Bitcoin Investors Plan to Commit Tax Fraud This Year*, The Motley Fool (January 7, 2018) https://www.fool.com/taxes/2018/01/07/36-of-bitcoin-investors-plan-to-commit-tax-fraud-t.aspx [https://perma.cc/4K92-R3XJ] (referencing a cryptocurrency user poll conducted by www.lendedu.com, https://www.lendedu.com/blog/investing-in-bitcoin [https://perma.cc/4QWZ-AUNM].

35.     Since transactions can be difficult to trace and many cryptocurrencies inherently have a pseudo-anonymous aspect, taxpayers may use them to hide taxable income. This is illustrated by the

actions of the taxpayers described in Part II.C., below.  Each of the taxpayers described in Part II.C. held cryptocurrency and conducted transactions through Kraken, which were not reported on federal income tax returns.

36.   My research has also identified individuals prosecuted and convicted of federal crimes for money laundering and/or operating an unlicensed money services business involving cryptocurrency transactions, including certain taxpayers discussed in Part II.D., below.

37.   In the experience of the IRS, tax noncompliance increases when there is no third-party information reporting.  Taxpayers are less likely to report and pay taxes on income that is not independently reported to the IRS by a third party.  IRS "tax gap" studies consistently show that tax compliance is far higher when reported income amounts are subject to information reporting by third parties.  The most recent such study, published on September 26, 2019, based on 2011-2013 data, concluded that the overall rate of underreporting of income that was not subject to third-party information reporting was 55 percent, compared to 5 percent for amounts subject to substantial information reporting but no withholding, and 1 percent for amounts subject to substantial information reporting and withholding.  *See* IRS Publication 1415 (Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2011-2013, (September 2019) http://www.irs.gov/pub/irs-pdf/p1415.pdf [https://perma.cc/2XM5-PDNH].  Where there is no third-party information reporting of cryptocurrency transactions for tax purposes, as is the case with Kraken, the likelihood of underreporting is significant.

38.   During the IRS's summons enforcement litigation against Coinbase, the IRS determined that for 2013-2015, only 800 to 900 taxpayers per year filed tax returns with a property description related to bitcoin or virtual currency despite the fact that Coinbase alone had serviced more than 5.9 million customers and handled more than $6 billion in transactions during that time.  *United States v. Coinbase, Inc., et al.*, 120 A.F.T.R.2d 2017-6671, 2017 WL 5890052, *4 (N.D. Cal. Nov. 28, 2017).

39.   The IRS has recently determined that post-Coinbase the number of taxpayers filing tax returns with a property description related to bitcoin or virtual currency has increased.  Running the same search ran in the Coinbase litigation, the IRS found that 3,926 taxpayers in 2016, 82,518 for 2017, and 88,976 in 2018, filed a return reporting bitcoin or virtual currency.  While these numbers reflect a

positive increase in reporting, these numbers still fall far short of what would be expected given the number of users, transactions, and value that the virtual currency exchanges publicize occur on an annual basis.

40.     Since Coinbase complied with the John Doe summons, the IRS has continued to reach out to taxpayers regarding their reporting requirements, conduct examinations, and make criminal investigation referrals.  These compliance efforts are ongoing and will remain a priority.  The IRS has also received submissions through its voluntary disclosure practice reporting additional taxes or changes in tax attributes relating to failures to report income from virtual currency transactions.  Since issuing more than 10,000 Virtual Currency Compliance campaign letters to taxpayers in July 2019, the IRS has received amended returns reporting virtual currency transactions for tax years 2013 through 2018.  As a result of the letters, the IRS has made more than $13.1 million in assessments to date.  These assessments are the result of taxpayers filing amended returns that contain previously unreported virtual currency transactions.  Separately, the IRS has contacted taxpayers who have not filed returns reporting virtual currency by sending notices related to virtual currency.  Those notices have already resulted in more than $11.9 million in assessments.  The IRS anticipates assessments will increase as it continues to pursue civil and criminal investigations.

41.     More recently based on internal and external data available to the IRS, letters were sent to taxpayers who conducted transactions with foreign virtual currency exchanges and may have failed to properly report such transactions and associated income.

42.     As detailed below in paragraphs 70 to 78, in my experience as a Revenue Agent and supported by further information available to the IRS, the IRS has a reasonable basis for believing there are U.S. taxpayers with accounts at Kraken who are not in compliance with internal revenue laws because they are not correctly reporting certain items or are simply failing to report any income or tax relating to cryptocurrency transactions.

## II.     KRAKEN

### A.     Organization and Structure

Declaration of Karen Cincotta in Support of
Ex Parte Petition For Leave
to Serve "John Doe" Summons            11

43.     Payward, Inc. is a Delaware corporation incorporated on July 28, 2011.  It is the parent corporation for multiple subsidiaries located in both the United States and foreign jurisdictions.

44.     Payward, Inc., along with its subsidiaries (collectively, "Kraken"), operates a digital currency exchange under the trade name Kraken through the website www.kraken.com [https://perma.cc/3A4V-8TWG].

45.     As indicated in its Terms of Service agreement covering the applicable years 2016 through 2020, Kraken provided users (customers) with the following services:

> Kraken provides you with a simple and convenient way to trade legal tender (such as U.S. dollars and Euros) for digital assets (such as bitcoins and ripples) and vice versa, and to trade one type of digital asset for another type of digital asset.  You may also use our Services to purchase and sell digital assets directly from and to us.  Our services do not provide users with the ability to trade one form of legal tender for another form of legal tender.  Additionally, the range of services available to you will depend in part upon the country or U.S. state from which you access Kraken.

Kraken Terms of Service, Summary (Sept. 27, 2016), https://web.archive.org/web/20161015083855/https://www.kraken.com/en-us/legal https://perma.cc/RM2D-NBBS; *see* Kraken Terms of Service, Summary (Dec. 13, 2019) https://www.kraken.com/en-us/legal [https://perma.cc/QL4E-LBZK].

46.     Kraken was founded in 2011 by Jesse Powell, who is currently the company's Chief Executive Officer.

47.     Kraken is one of the largest digital currency exchanges with over 4 million clients and over $140 billion in trading activity since 2011.  It has been reported that as of the end of 2017, Kraken was registering up to 50,000 new users a day. https://www.businessinsider.com.au/coinbase-reportedly-made-more-than-1-billion-in-revenues-last-year-2018-1 [https://perma.cc/QL4E-LBZK].

48.     Kraken is headquartered in the United States – San Francisco, California – and operates in over 190 countries worldwide, but does not provide services to residents of Afghanistan, Cuba, Guinea-Bissau, Iran, Iraq, North Korea, or Tajikistan.  Kraken, https://support.kraken.com/hc/en-us/articles/360001368823-Geographic-Restrictions-Can-I-use-Kraken-if-I-m-from-

[https://perma.cc/7AVX-EDQW].  Within the United States, Kraken does not operate or provide services to residents of Washington State and New York.  *Id.*

49.     Kraken users enter into an account services agreement with local subsidiaries of parent company Payward, Inc.  Depending on geographical location, an individual user's contract is with the following subsidiaries of Payward:

- United States – Payward Ventures, Inc., 237 Kearny St., Suite 102, San Francisco, CA 94108;

- European Union – Payward Ltd., 6th Floor, One London Wall, London, EC2Y 5EB;

- Japan – Payward Asia, Nibancho 9-3, Chiyoda-ku, Tokyo 102-0084, Japan; and

- All other locations – Payward Pte. Ltd., 8 Tomasello Boulevard, #15-04, Suntec Tower Three, Singapore 038988.

Kraken Privacy Notice, https://www.kraken.com/en-us/legal/privacy [https://perma.cc/Z58T-VG7G].

50.     As the U.S.-facing operating arm of Payward, this John Doe summons is directed to Payward Ventures, Inc.

51.     Kraken, through Payward Ventures, Inc., registered on November 6, 2018, as a money services business ("MSB") as required by 31 C.F.R. § 1022.380(a)-(f).  Kraken, https://support.kraken.com/hc/en-us/articles/360031282351-Is-Kraken-licensed-or-regulated- [https://perma.cc/8M7M-KSD7].  As an MSB, Kraken is required by the Bank Secrecy Act (Title 31, U.S. Code) to conduct basic customer risk assessments to determine the level of risk associated with the account and whether further due diligence is necessary.  *See* 31 U.S.C. § 5311; 31 C.F.R § 1010.100(ff)(5), § 1022.210; FinCEN Guidance No. FIN-2019-A003: Advisory on Illicit Activity Involving Convertible Virtual Currency (May 9, 2019) https://www.fincen.gov/sites/default/files/advisory/2019-05-10/FinCEN%20Advisory%20CVC%20FINAL%20508.pdf [https://perma.cc/5958-EY2Z].

52.     Each MSB is required to retain the records described below with respect to any transmittal of funds in the amount of $3,000 or more.  *See* 31 C.F.R §§ 1010.100(ff)(5), 1010.410, 1022.210.  Such records are required to be retained by the MSB for 5 years.  31 C.F.R. § 1010.430(d).

53.     If the sender of the funds is an established customer of the MSB, the MSB must retain the following information:

- Name and address of the transmitter;
- Amount of the transmittal order;
- Execution date of the transmittal order;
- Any payment instructions received from the transmitter;
- The identity of the recipient's financial institution;
- As many of the following items as are received with the transmittal order: (i) name and address of the recipient, (ii) the account number of the recipient, and (iii) any other specific identifier of the recipient; and
- Any form relating to the transmittal of funds that is completed or signed by the person placing the transmittal order.  31 C.F.R. § 1010.410(e)(1)(i).

54.     If the sender of the funds is not an established customer of the MSB, the MSB must retain all of the information specified in the preceding paragraph, plus:

- The type and number of the identification documents reviewed to verify the transmitter's identity, such as a driver's license, social security number or other tax identification number, or a passport or alien identification number; and
- A copy or record of the transmitter's method of payment.

31 C.F.R. § 1010.410(e)(2).

55.     If the recipient of the funds is an established customer of the MSB, the MSB must retain an original, microfilm, other copy, or electronic record of the transmittal order.  31 C.F.R. § 1010.410(e)(1)(iii).

56.     If the recipient of the funds is not an established customer of the MSB, the MSB must retain the following information:

Declaration of Karen Cincotta in Support of
Ex Parte Petition For Leave
to Serve "John Doe" Summons          14

- The information described in paragraphs 54 and 55, above;

- An original, microfilm, other copy, or electronic record of the transmittal order;

- If the MSB knows that the person receiving the proceeds is not the ultimate recipient, the ultimate recipient's name, address, and taxpayer identification number, alien identification number, or passport number (along with the country of issuance); and

- If the proceeds are delivered other than in person, a copy of the check or other instrument used to pay the transmittal, or the information contained on the check or other instrument, as well as the name and address of the person to whom it was sent.

31 C.F.R. § 1010.410(e)(3).

57.    In addition, each MSB must develop, implement, and maintain an effective anti-money laundering program.  31 C.F.R. § 1022.210(a).  At a minimum, the program must include provisions for verifying customer identification, filing reports, creating and retaining records, and responding to law enforcement requests.  31 C.F.R. § 1022.210(d)(1)(i).

**B.    Business Operations**

58.    During the applicable years 2016 through 2020, Kraken described its cryptocurrency trading services for users as: "Kraken provides you with a platform that matches your trades with open orders from other users of our service at your direction."  Kraken Terms of Service, (Sept. 27, 2016), https://web.archive.org/web/20161015083855/https://www.kraken.com/en-us/legal https://perma.cc/RM2D-NBBS; Kraken Terms of Service (Dec. 13, 2019) https://www.kraken.com/en-us/legal [https://perma.cc/Z4SZ-5N84].

59.    Unlike other digital currency exchange platforms, Kraken does not provide cryptocurrency "wallet" services.  "Kraken is an exchange service, not a wallet service.  We provide clients the ability to deposit funds to our corporate wallet for safekeeping while the funds are being exchanged or used for trading, but we do not provide a personal wallet service."

1  Kraken,https://support.kraken.com/hc/en-us/articles/115006441267-Kraken-is-not-a-wallet-service

2  [https://perma.cc/TA9T-NL6F].

3       60.    As of January 8, 2020, Kraken supported trading for 31 different cryptocurrencies.  As of

4  March 29, 2021, Kraken supports trading for 56 different cryptocurrencies.

5  https://support.kraken.com/hc/en-us/articles/360000678446-Cryptocurrencies-available-on-Kraken

6  [https://perma.cc/L45Y-Z96U].

7       61.    To use Kraken, a user creates an account by accessing Kraken's website at

8  www.kraken.com and clicking on the "Create Account" button in the upper-right corner.  From there,

9  the user is asked to submit a new username and password on the signup form.  *See*

10  https://support.kraken.com/hc/en-us/articles/201352206-Verification-level-requirements

11  [https://perma.cc/KY9A-Z5ME].

12       62.    In order to be eligible to register a Kraken account and use Kraken services, a user must:

13       •   Be 18 years or older of age;

14       •   Reside in a supported area (as mentioned in paragraph 48, above); and

15       •   Provide certain identification verification documents based on each different account

16           level: starter, intermediate, or pro.

17  *Id.*

18       63.    For all levels, verification requirements include:

19       •   two-factor authentication for login;

20       •   email address;

21       •   full name;

22       •   date of birth;

23       •   phone number; and

24       •   physical address.

25  *Id.*

26

27

Declaration of Karen Cincotta in Support of
Ex Parte Petition For Leave
to Serve "John Doe" Summons          16

64.     In addition, valid ID, proof of residence, occupation, and social security number (for U.S. clients) are required for intermediate-level and pro-level accounts.  An identification confirmation photo may be required as part of either intermediate-level or pro-level account verification.  *Id.*

65.     A Know-Your-Customer ("KYC") application is required for pro-level account individuals, corporations, and institutions.  A pro-level account is the highest-level account for high-volume traders and high net worth individuals.  KYC questionnaires for individuals include, but are not limited to, email address, tell us about yourself questions, public account ID, purpose of account, country of residence, deposit/withdrawal information, employment, net worth, primary source of wealth, and expected trading activities.  KYC questionnaires for entities include, but are not limited to, legal name, business address, country, website, contact information, industry, goods and services, government-issued business registration or tax identification number, account accessor information, purpose of account, net worth, deposit/withdrawal information, trading activities, and source of funds. *Id.*

66.     Deposits into and withdrawals out of a Kraken trading account can be made in-kind (i.e., in a particular cryptocurrency offered for trading on Kraken's platform).  Deposit and withdrawal limits (daily and monthly) are based on a user's account-verification level.  https://support.kraken.com/hc/en-us/articles/360001449826-Deposit-and-withdrawal-limits-by-verification-level [https://perma.cc/F5X3-EUDK].

67.     Deposits and withdrawals can also be made in certain fiat currencies (U.S. dollars (USD), Euros (EUR), British Pound Sterling (GBP), Japanese Yen (JPY), Swiss Franc (CHF), and Canadian dollars (CAD)) if a user has either an intermediate-level or pro-level account.  Fiat currencies are generally deposited via electronic transfer.  *Id.*

68.     Kraken does not currently accept cash, debit cards, credit cards, PayPal, or similar services.  Deposits via cash or debit card (in-person) are only possible in Canadian Dollars.  Kraken's reason for this limitation is that accepting cash makes it difficult to comply with financial regulations, and the near-instant and practically irreversible nature of cryptocurrency transactions means the risk of

fraudulent transactions is too high.  https://support.kraken.com/hc/en-us/articles/360000381846-Fiat-currency-deposit-options-fees-minimums-and-processing-times- [https://perma.cc/8QD5-Q4U].

69.     Kraken also does not accept fiat currency deposits from, or withdrawals to, third-party payment processors ("TPPPs") for regulatory compliance reasons.  Kraken states that it is too difficult to verify that a transaction came from, or is destined for, an account associated with the particular Kraken user.  TPPPs that Kraken does not support, include but are not limited to: The Currency Cloud, Earthport, Neteller, PayPal, Paysera, and Western Union.  Kraken said it might make an exception to this rule if a TPPP issues a user a unique bank account number or an International Bank Account Number ("IBAN") that is in the specific user's name.  https://support.kraken.com/hc/en-us/articles/360000382423 [https://perma.cc/87N8-ZRN8].

**C.     Tax Compliance Concerns Related to Kraken Users**

70.     Taxpayer 1 is a U.S. citizen.  Taxpayer 1 has not filed an income tax return for tax years 2016, 2017, 2018, 2019, and 2020.  Taxpayer 1's last-filed return, filed in 2015, reported minimal wages and no other income.  According to information available to the IRS, Taxpayer 1 has owned two single-member limited liability companies ("SMLLCs") since 2017 that have never filed any U.S. income tax or information returns.  Taxpayer 1 and his SMLLCs both have multiple accounts at Kraken.  Since January 1, 2017, Taxpayer 1 and his SMLLCs engaged in more than $39 million in financial transactions.  At least 20% of these transactions related to cryptocurrency held in accounts at Kraken.  Moreover, Taxpayer 1's transactions included unusual movements of funds, including movements to multiple locations, with no apparent economic or business purpose.  With respect to the Kraken accounts, the transactions are indicative of "layering" – bitcoin deposits into the accounts were converted to U.S. dollars, then immediately converted back to bitcoin, and then immediately withdrawn from the accounts.  These transactions were typically completed within 24 hours from the initial deposit of bitcoin into the accounts.  Finally, Taxpayer 1 had over $1 million in cash deposits and cash withdrawals at various banks.  Based on my experience as a Revenue Agent, these types of transactions are indicative of taxable income, however, Taxpayer 1 and his SMLLCs have not filed any tax returns reporting income from this activity.

71.     Taxpayer 2 is a U.S. resident.  From 2013 to 2019, Taxpayer 2 filed income tax returns reporting minimal wages and minimal Schedule C gross receipts from a sole proprietorship business. Based on information available to it, the IRS has discovered that Taxpayer 2 had numerous accounts at a digital currency exchange.  Between 2016 and 2018, Taxpayer 2, along with other individuals, engaged in cryptocurrency transactions exceeding $12 million.  The transactions appeared to relate to the operation of a financial scam.  Taxpayer 2 and his partners received transfers of cryptocurrency from numerous unknown personal user addresses for no apparent business or economic reason.  After receipt of cryptocurrency at one digital currency exchange, Taxpayer 2 and his partners transferred that cryptocurrency to other accounts they controlled at other digital currency exchanges, including Kraken. Based on my experience as a Revenue Agent, these types of transactions are indicative of taxable income, however, Taxpayer 2 has not filed any tax returns reporting income from this activity.

72.     Taxpayer 3 is married and a U.S. resident.  Taxpayer 3 and spouse have filed joint income tax returns since at least the 2014 tax year, reporting, primarily, wage income.  Beginning in 2018, Taxpayer 3 reported income and expenses relating to a Schedule C business involved in digital asset trading.  Based on information available to it, the IRS discovered that Taxpayer 3's Schedule C business engaged in large transactions exceeding $56 million, of which more than 12% was conducted through an account with Kraken.  These transactions include incoming transfers from various other digital currency exchanges for which the relationship, purpose, and source of funds is unknown, followed by outgoing transfers to import/export companies that do not appear to relate to Taxpayer 3's occupation or Schedule C business.  Based on a review of information available to the IRS and my experience as a Revenue Agent, it appears that Taxpayer 3 has underreported his personal and business income by almost $1 million, some of which appears to arise from transactions conducted through Taxpayer 3's Kraken account.

73.     Taxpayer 4 is a U.S. resident.  From 2016 through 2018, Taxpayer 4 reported only minimal wage income on his income tax returns.  Based on information available to it, the IRS discovered that during 2016 through 2018, Taxpayer 4 had accounts at multiple digital currency exchanges.  During the period between November 2018 and February 2019, Taxpayer 4 engaged in

cryptocurrency transactions exceeding $5.6 million.  Most of this activity originated from Taxpayer 4's account with Kraken.  Based on my experience as a Revenue Agent, these types of transactions are indicative of taxable income, however, Taxpayer 4 has not filed any tax returns reporting income from this activity.

74.     Taxpayer 5 is a U.S. citizen.  In March 2018, Taxpayer 5 entered the IRS's domestic voluntary disclosure program.  In late 2018, Taxpayer 5 submitted delinquent tax returns for the tax years 2015 and 2016, reporting substantial taxable income – over $189,000 for 2015, and $2,300,000 for 2016.  Taxpayer 5 admitted that this income related to various cryptocurrency transactions including transactions on multiple digital currency exchanges, one of which was Kraken.  In early 2020, Taxpayer 5 submitted delinquent tax returns for the tax years 2017 and 2018, reporting taxable income – over $2,000,000 for 2017, and none for 2018.  In between 2017 to 2018, Taxpayer 5 had over $23 million in cash deposits and cash withdrawals at multiple digital currency exchanges, including Kraken.  Based on my experience as a Revenue Agent, these types of transactions are indicative of taxable income, however, Taxpayer 5 failed to initially file his 2015, 2016, 2017, and 2018 tax returns and since only did so because he entered the IRS's voluntary disclosure program.

**D.     Samples of Potential Violations of Internal Revenue Laws Based on a Review of Public Records**

75.     In addition to reviewing the IRS's own records, I have researched public records. Through my research, I have learned of criminal proceedings in the United States in which the defendants used accounts held at Kraken to conceal proceeds from criminal activity.

76.     In the 2018 case of *United States v. Backpage.com*, Case No. 18-CR-465 in the District of Arizona, the U.S. Attorney's Office for the District of Arizona obtained a 93-count indictment against Backpage.com, LLC and numerous related parties, including the founders.  Upon waiver of the indictment, defendant Backpage.com was charged and ultimately pled guilty to one count of money laundering conspiracy.  The proceeds from Backpage.com's criminal activity were routed through accounts held at various digital currency exchanges, including Kraken.

77.     In the 2018 case of *United States v. Joseph Kim*, Case No. 18-CR-107 in the Northern District of Illinois, the U.S. Attorney's Office for the Northern District of Illinois filed an indictment

against Joseph Kim.  Defendant Kim was charged with wire fraud and pled guilty.  As part of his

scheme, defendant Kim defrauded his employer of approximately 55 bitcoin (worth approximately

$440,000 at the time of the theft).  The ill-gotten cryptocurrency was transferred into defendant Kim's

account with Kraken.

78.     In my experience, individuals who conceal the proceeds of criminal or fraudulent activity

in anonymous accounts such as offshore bank accounts or using virtual currency also conceal that

income from the IRS.

## III.     THE "JOHN DOE" SUMMONS REQUIREMENTS ARE MET

79.     As described in greater detail below: (A) the "John Doe" summons to Kraken relates to

the investigation of an ascertainable group or class of persons; (B) there is a reasonable basis for

believing that such group or class of persons has failed or may have failed to comply with provisions of

the internal revenue laws; and (C) the information and documents sought to be obtained from the

examination of the records or testimony (and the identity of the persons with respect to whose tax

liabilities the summons is issued) are not readily available from sources other than Kraken.

### A.     The Summons Describes a Particular Person or Ascertainable Class of Persons

80.     The proposed John Doe summons to Kraken seeks information regarding unknown U.S.

taxpayers who directly or indirectly held or had control over any combination of user accounts at Kraken

with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in

any one year during the period January 1, 2016 through December 31, 2020.

### B.     There Is a Reasonable Basis to Believe That Members of the John Doe Class May Have Failed to Comply With the Internal Revenue Laws

81.     Cryptocurrency, along with other virtual currencies, is treated as property under the

internal revenue laws.  The receipt and disposition of cryptocurrency may give rise to federal tax

liabilities.  As detailed in this declaration, the IRS is aware of numerous situations where owners of

cryptocurrency have failed to comply with internal revenue laws as they relate to transactions conducted

with cryptocurrency.

82.     In my investigation, I was able to identify specific individuals, discussed in paragraphs 70-74 above, who held accounts with Kraken and failed to comply with their tax reporting requirements under the internal revenue laws.

83.     The information available to the IRS and its experience with other compliance initiatives suggest that many unknown U.S. taxpayers engage in virtual currency transactions.  Because the IRS does not know the identity of the individuals within the John Doe class, the IRS cannot yet examine the income tax returns filed by those taxpayers to determine whether they have properly reported any income attributable to virtual currencies.

84.     Taken as a whole, the information obtained by the IRS and discussed in this declaration indicates that members of the John Doe class may have failed to properly report their cryptocurrency transactions or failed to report the associated income and pay the proper amount of tax.

**C.     The Requested Materials (and the Identities of the Members of the John Doe Class) Are Not Readily Available From Other Sources**

85.     To my knowledge, and based on my experience, Kraken is the only repository of information sought by the proposed summons.  To the extent that there are U.S. taxpayers who are also Kraken users and their identities are known to the IRS at the time the summons is issued, such U.S. taxpayers/Kraken users will be excluded from the John Doe class.

86.     The records sought by the John Doe summons are not otherwise reasonably and timely available to the IRS.

**D.     The Information Sought Is Narrowly Tailored to Information that Pertains to the Failure or Potential Failure of the John Doe Class to Comply with the Internal Revenue Laws**

87.     Additionally, the information sought in the summons is narrowly tailored to seek only information that is necessary for the IRS to identify and investigate whether individuals in the John Doe class complied with the internal revenue laws with respect to their virtual currency activity.

88.     The summons, attached as **Exhibit A**, seeks records that may reveal the identity and transaction activity of unknown U.S. Kraken users, who had control over any combination of accounts with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year from January 1, 2016 through December 31, 2020.

Declaration of Karen Cincotta in Support of
Ex Parte Petition For Leave
to Serve "John Doe" Summons            22

89.     The information requested is narrowly tailored to assist the IRS with identifying and beginning to investigate U.S. taxpayers with accounts at Kraken that have potentially failed to comply with the internal revenue laws.  The requests are directed at two broad categories:  user identity information and transaction activity.

90.     Requests one through four are directed at adequately identifying the John Doe class members so that transactional data can reasonably be associated with a particular person.  Unlike traditional financial accounts, Kraken accounts can be opened with limited personal-identifying information.  Unlike traditional bank accounts, there are no signature cards or written account applications.  As a result, linking a particular account to an actual person for purposes of examining such taxpayer's compliance with the internal revenue laws requires access to whatever identifying information Kraken obtained from the user during the opening of the account or during its subsequent usage/dealings.

91.     Requests five and six are directed at obtaining transactional information that may permit the IRS to evaluate whether a particular taxpayer complied fully with internal revenue laws.

92.     The IRS expects the summoned records will produce leads to help it identify U.S. taxpayers that have transacted in cryptocurrency at the specified floor level through Kraken at any time during the period specified in the John Doe summons, and who may have failed to comply with internal revenue laws with respect to reporting those transactions.  The floor transactional level and specified tax period for the John Doe summons are described in paragraph 88 above.

93.     Addressing the requests specifically, summons request number 1 reflected on **Exhibit A** seeks account registration records for each account owned or controlled by a user, including the complete user profile, history of changes to the user profile, user preferences, user history (including confirmed devices and account activity), user payment methods, and any other information related to the funding sources for the account.  The IRS is not seeking any individual user's personal password, pin information, private keys, security settings, or account recovery information.

94.     The requested account registration records and user profile will be used by the IRS to verify the identity of the applicable Kraken user and whether that user is a U.S. person.

95.     The requested history of changes to the user profile may assist the IRS in identifying whether an applicable Kraken user has employed an alias, nominee, or some other tactic to disguise his identity after the initial user account setup.  This information may be relevant in determining, and verifying, the identity of Kraken users who are U.S. persons.

96.     The requested user preferences and history may help the IRS understand how the account was managed or controlled by the user and any other third parties.  This information may also be relevant in determining, and verifying, the identity and transaction activity of Kraken users who are U.S. persons.

97.     The requested user payment methods may identify for the IRS sources of funds that may have been undisclosed by the taxpayer for tax purposes.  This information may be relevant in determining, and verifying, the identity and transaction activity of Kraken users who are U.S. persons.

98.     Summons request number 2 reflected on **Exhibit A** seeks any records associated with Know-Your-Customer due diligence that Kraken performed on its applicable users that was not produced in response to request number 1.  These records may be relevant in determining, and verifying, the identity of Kraken users who are U.S. persons.

99.     Summons request number 3 reflected on **Exhibit A** seeks all correspondence between Kraken and its applicable users (or any third party that has access to the account) about the account. This information may be relevant in determining, and verifying, the identity of the account user or how the account was used.  Moreover, communications pertaining to the account may be relevant to revealing other accounts controlled by the same user.

100.    Summons request number 4 reflected on **Exhibit A** seeks all exception reports produced by Kraken's anti-money laundering ("AML") system and all records related to investigations of those reported exceptions.  These records may be relevant in assisting with tax-compliance investigations by identifying beneficial owners and parties involved in virtual currency transactions conducted through aliases, pseudonyms, or nominees as well as identifying internet protocol and email addresses of U.S. persons.  The records sought do not include any suspicious activity reports ("SARs") that were ultimately generated as a consequence of an AML alert or any other information that would reveal the

existence of a SAR.

101.    Summons request number 5 reflected on **Exhibit A** seeks all records relating to a user's cryptocurrency transactions in the account including the buying or selling of cryptocurrency units, the lending or margin trading of cryptocurrency units, the deposit or withdrawal of cryptocurrency units into the account, and the receipt of any units into the account by other means such as a chain-splitting fork or promotional events.  Because cryptocurrency is treated as property for federal tax purposes and a taxpayer is required to report cost basis of cryptocurrency dispositions based on either specific identification or the "first-in, first-out" method, the IRS needs the complete transaction history to verify whether cryptocurrency transactions were property reported.

102.    Summons request number 6 reflected on **Exhibit A** seeks all records relating to a user's U.S. dollar or foreign legal tender transactions (together, fiat currency) in the account.  Funding information is necessary for the IRS to determine the source of funds for cryptocurrency purchases and whether a user properly reported all taxable income for a particular tax year.  For example, it is the IRS's experience that a taxpayer who reports minimal taxable income for a tax year while simultaneously purchasing large amounts of property (such as virtual currency) in the same tax year may not be fully reporting their taxable income.

**IV.    Conclusion**

103.    Based upon the foregoing, I believe the information sought by the John Doe summons to Kraken will allow the IRS to identify U.S. persons who may have failed to comply with their obligation to report and pay tax on cryptocurrency transactions during the years ended December 31, 2016 through December 31, 2020.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this <u>30</u> day of March 2021, in Laguna Niguel, California.

_____
KAREN CINCOTTA
Supervisory Internal Revenue Agent
Internal Revenue Service