DAVID A. HUBBERT
Acting Assistant Attorney General

AMY MATCHISON (CA Bar No. 217022)
Trial Attorney
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:      (202) 307-6422
Fax:            (202) 307-0054
Email: Amy.T.Matchison@usdoj.gov
           Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE TAX LIABILITIES OF: | Civil Number: 3:21-cv-02201-JCS |
| JOHN DOES, United States person(s), who directly or indirectly had authority over any combination of accounts held with Payward Ventures Inc., d/b/a Kraken or Kraken.com, or its predecessors, subsidiaries, divisions, or affiliates (collectively, "Kraken"), with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the period January 1, 2016 through December 31, 2020. | **UNITED STATES' RESPONSE TO ORDER TO SHOW CAUSE WHY PETITION SHOULD NOT BE DENIED** |

The Court has ordered the United States to show cause why its ex parte petition for leave to serve a "John Doe" summons on Payward Ventures, Inc. and Subsidiaries (Kraken) should not be denied for failure to meet the "narrowly tailored" requirement of 26 U.S.C. § 7690(f). (Docket No. 6).  The United States submits this response.

I.      INTRODUCTION

The requirement that a John Doe summons be "narrowly tailored to information that pertains to the failure (or potential failure) of the [John Doe class] to comply with one or more provisions of the internal revenue law" was added to 26 U.S.C. 7609(f) to ensure that "the information sought in the summons [is] at least potentially relevant to the tax liability of an ascertainable group."  H.R. Rep. No.

13995683.1

1    116-39, 116th Cong. 1st Sess, at 41 (April 9, 2019).  The John Doe summons the IRS seeks to serve on

2    Kraken is part of an ongoing, extensive investigation involving substantial IRS resources that is

3    producing real results – millions of dollars in previously unreported and unpaid taxes recovered for the

4    Treasury to date.  And the summons seeks information that is needed to identify taxpayers who may not

5    be complying with the law.

6           In its Order, the Court referred to another Magistrate Judge's decision in a separate summons

7    enforcement proceeding, *United States v. Coinbase*, No. 17-cv-01431-JSC, 2017 WL 5890052, (N.D.

8    Cal. Nov. 28, 2017).  In *Coinbase*, the Court enforced in part a narrowed John Doe summons, but found

9    that broad categories of information, like some of those requested here, were not relevant under *United

10   States v. Powell*, 379 U.S. 48 (1964).  The Court reasoned that "the IRS should first review basic user

11   information and transaction histories before determining whether further subpoenas—either to the

12   cryptocurrency exchange or to individual users—were necessary."  (OSC, Docket No. 6 (citing *United

13   States v. Coinbase*, at *6-7).  In effect, the Court in *Coinbase* created a novel summons process by which

14   the IRS had to pursue its investigation in phases.  The United States does not believe that this phased,

15   limited-information-review approach is what *Powell* requires or Congress intended in modifying

16   § 7609(f).  Indeed, if Congress had believed that the IRS should be initially limited to getting only the

17   most basic identifying information, it would have legislated accordingly.  Instead, Congress wanted to

18   clarify that the information sought in a John Doe summons had to be "at least potentially relevant to the

19   tax liability of the [John Doe class]."  H.R. Rep. No. 116-39, at 40-42.  Congress reiterated that the new

20   requirement was not intended to change the well-established enforcement standard in *Powell* or change

21   the IRS's burden of proof.  *Id.*

22          The narrowly tailored requirement was intended to require the IRS to carefully evaluate what

23   information it needs to identify the members of a John Doe class and to determine whether those class

24   members complied with the internal revenue laws.  As detailed below, the United States believes that its

25   requests are narrowly-tailored to seek "information that pertains to the failure (or potential failure) of the

26   person or group or class of persons referred to in [§ 7609(f)(2)] to comply with one or more provisions

27   of the internal revenue law," and reflect lessons learned from the limited information the IRS received

United States' Response to
Order to Show Cause
Case No. 3:21-cv-02201-JCS          2

13995683.1

1    from the partially enforced Coinbase John Doe summons.  But to assuage potential concerns, the IRS

2    has revised some of the requests in the proposed John Doe summons to Kraken.  The revised proposed

3    summons is attached as Exhibit B to the Second Declaration of Karen Cincotta ("Second Declaration"),

4    filed concurrently with this Response, and the contents of the revised proposed summons are explained

5    below.

6    **II.    DISCUSSION**

7            In enforcing the John Doe summons in part, the Court in *Coinbase* explained that it viewed the

8    IRS's first investigative task as being to review the transaction information of each account holder to

9    identify whether there was any taxable gain.  *Coinbase*, *supra*, at *7.  But the IRS's process for

10   identifying whether there are any taxable gains based on the information it receives from a John Doe

11   summons, such as the one in *Coinbase*, is not so straightforward.  As in *Coinbase*, the transaction

12   information sought from Kraken relates to cryptocurrency.  Cryptocurrency is treated as property for

13   federal tax purposes.  *See* Notice 2014-21, 2014-16 I.R.B. 938, 2014 WL 1224474 (Mar. 26, 2014).

14   When reporting gains and losses from the sale of cryptocurrency, a taxpayer may use different methods

15   for calculating that gain or loss.  For example, a taxpayer may use the specific identification method to

16   pair the sale of a specific unit of cryptocurrency against a specific acquisition.  *See* IRS Virtual Currency

17   FAQs, FAQ#39 & 40, *available at:* [Frequently Asked Questions on Virtual Currency Transactions |](#)

18   [Internal Revenue Service (irs.gov)](#).  Alternatively, where a taxpayer has not used the specific

19   identification method or lacks records to fully support the use of that method, the taxpayer must rely on

20   the so-called "first-in-first-out" accounting method that simply pairs the sale of a unit of cryptocurrency

21   against the oldest-acquired unit chronologically.  *Id.* at FAQ#41.  These approaches allow a taxpayer

22   flexibility in how they calculate gains or losses on the sale of cryptocurrency units held as capital assets.

23   As a result, the IRS cannot make a "taxable gain" determination by looking at an account holder's

24   transaction information in isolation.  The IRS must (1) identify the account holder, (2) determine

25   whether that individual filed a tax return for the relevant tax year, (3) determine whether that individual

26   reported cryptocurrency transactions on that return, and (4), if so, whether what was reported, or the

27   approach taken in reporting the information, indicates compliance with the internal revenue laws.

United States' Response to
Order to Show Cause

13995683.1

1    This analysis can become even more complicated because many taxpayers operating in the

2    cryptocurrency space have accounts at more than one cryptocurrency exchange and also make use of

3    personal user wallets.  For example, the IRS has conducted examinations where the taxpayer involved

4    had cryptocurrency transactions at three or more distinct exchanges and, at times, upwards of ten

5    exchanges.  Second Declaration at ¶ 6.  Current tax reporting requirements do not require a taxpayer to

6    identify on their tax return on which cryptocurrency exchange taxable transactions occurred.  *Id.*  This

7    makes rooting out tax non-compliance much more complex than simply reviewing the account

8    transaction information for one account holder on one exchange in isolation.  As explained below,

9    having additional specific information about the nature of an account holder's non-transactional activity

10   is necessary when the IRS is making its initial determination about who the correct taxpayer is, and in

11   what other activity that individual may be engaging.  This information is required for the IRS to reach a

12   reasonably-accurate conclusion about tax compliance.  The IRS's investigation is not solely focused on

13   identifying tax non-compliance for account holders at a single exchange like Kraken, but rather to

14   identify tax non-compliance for individuals transacting in cryptocurrency with accounts at that exchange

15   who may have additional accounts at other exchanges.

16   Establishing, beyond dispute, the account holder's identity within the IRS's own computer

17   systems is vital to determining whether there has been tax non-compliance.  This requires linking a

18   particular account holder to a particular name and taxpayer identification number within the IRS's

19   internal databases.  As the Court in *Coinbase* correctly recognized, basic information such as name,

20   address, date of birth, and taxpayer ID number can go a long way in establishing the identity of a

21   taxpayer.  But in the IRS's experience, including its most recent experience processing the Coinbase

22   summons information, those four data points alone are insufficient.  This is because at times taxpayers

23   will use aliases, false addresses, or post office boxes, fictitious entity names, or other means to disguise

24   their true identity and taxpayers who create false identities are more likely to evade their taxes.  And the

25   IRS is not guaranteed to always receive those four data points for each account holder because certain

26   pieces are either missing (such as date of birth where an entity name is used), incomplete, or have been

27   falsified.

United States' Response to
Order to Show Cause
Case No. 3:21-cv-02201-JCS                4

**A.  The IRS Required More Information to Positively Identify the Coinbase John Does**

In processing the information provided in response to the *Coinbase* summons, the IRS encountered several problems.  First, Coinbase did not provide taxpayer ID numbers for more than 10% of the users (over 1,300 taxpayers).  Second Declaration at ¶ 10.  There were also over 150 instances in which the account data did not include a name and approximately 170 instances in which a pseudonym was provided rather than an actual name.  *Id.*  There were over 500 instances in which no date of birth information was provided and roughly 1,000 instances in which no physical address information was provided.  *Id.*  After consultation with the IRS, Coinbase, provided more user information that reduced the unknown names to only a few, instances of missing addresses were reduced to approximately 650, and missing dates of birth were reduced to slightly below 500.  *Id.* at ¶ 11.  Notably, Coinbase could not provide any of the missing taxpayer ID numbers.  *Id.*  Coinbase admitted that some of the account information was lacking because it had not been collected for some of the oldest accounts.  *Id.* at ¶ 12. In these situations, the four data points permitted by the Court in *Coinbase* were insufficient for the IRS to positively identify an actual taxpayer. *Id.*

Since that time, the IRS has used its own information and information gathered from other sources to positively identify approximately 530 additional taxpayers from the Coinbase information, but more than 750 taxpayers remain unknown to the IRS.  *Id.* at ¶ 14.  These still-unidentified taxpayers had cryptocurrency proceeds that exceeded $100,000,000 that the IRS cannot examine because the limited identity information it received precludes a positive identification.  *Id.* at ¶ 15.

In *Coinbase*, the Court's remedy for situations in which the four data points proved insufficient to make a positive identification was for the IRS to issue a follow-up summons to Coinbase for a specific taxpayer.  Issuing a follow-up summons with regard to a specific taxpayer is complicated where the IRS cannot establish the identity of the relevant taxpayer.  Section 7602 authorizes the IRS to issues summonses with respect to the tax liability of any person.  26 U.S.C. § 7602(a).  Section 7609(a), however, requires the IRS to provide notice to the specific person identified in the summons.  The IRS cannot meet this requirement when the threshold issue is the question of the taxpayer's identity.  When a

taxpayer's identity is unknown to the IRS, § 7609(f) provides the IRS with an exception to the notice requirement when the so-called "John Doe" procedures are followed.  As a practical matter, employing the approach contemplated in *Coinbase* would require the IRS to issue multiple John Doe summonses to the same third-party (such as Kraken).  Nothing in the flush language of § 7609(f) or its legislative history implies that the narrowly tailored requirement was intended to require the IRS to issue serial John Doe summonses to a third party, obtaining slightly more information with each iteration until it had just enough information to adequately administer the tax laws.[1]  Such a process would be extremely burdensome and time-consuming.

### B.  The IRS Will Need Additional Information to Identify Kraken Account Holders

According to its terms of service, Kraken has three account verification levels—starter, intermediate, and pro.[2]  Second Declaration at ¶ 17.  For all three account levels, Kraken gathers the user's email address, full name, date of birth, telephone number, and physical address.  *Id.* at ¶ 18.  Notably, Kraken does not require a taxpayer ID number for the starter account level.  *Id.*  For the intermediate and pro account levels, Kraken also requires a valid ID, proof of residence, and a taxpayer ID number (for U.S. residents).  *Id.* at ¶ 20.  At the pro account level, Kraken requires completion of a Know-Your-Customer questionnaire that for individuals includes: email address; tell us about yourself questions; public account ID; purpose of account; country of residence; deposit/withdrawal information; employment; net worth; source of wealth; and expected trading activities.  *Id.* at ¶ 21.  For businesses,

---

[1]  Additionally, the IRS's ability to examine taxpayers whose information is obtained through a John Doe summons is statutorily time-limited under § 6501(a).  Although that limitation period is tolled for a portion of time that production of information in response to the summons is pending (§ 7609(e)(2)), the statute is not tolled during the time while the IRS is reviewing the initial summons response and conducting an investigation to meet the requirements of § 7609(f) for a subsequent John Doe summons or while the court is considering a petition for approval of a second John Doe summons.  Taken as a whole, serial John Doe summons to the same third party is not a practical approach to tax administration given the limitations period on assessments.

[2] Kraken recently (during 2021) introduced a fourth account verification level—express—that is only available in the United States.  It fits between the starter and intermediate levels.  Because it did not exist during the period covered by the John Doe summons, the United States is not going to focus on its requirements.

1 the questionnaire includes: legal name; business address; country; website; contact information;

2 industry; goods and services; government-issued business registration or tax-identification number;

3 trading activities; and source of funds. *Id.* It is important to note that none of the account levels place

4 any restrictions on trading volume or value, meaning an individual with a starter account can trade

5 cryptocurrency in unlimited amounts (and generate significant amounts of taxable gain) without needing

6 to provide Kraken with a taxpayer ID number. *Id.* at ¶ 22.

7 　　All three account levels permit the user to trade on margin, although limits are placed based on

8 account level and all three account levels permit the user to earn more cryptocurrency by participating in

9 "staking."[3] *Id.* at ¶ 23. The primary distinction between the account levels relates to the ability to fund

10 the account with fiat currency (i.e., U.S. dollars) or only with cryptocurrency. *Id.* at ¶ 24. The starter

11 account level does not permit any deposits or withdrawals from the account to be made in fiat currency.

12 The intermediate and pro level accounts permit deposits and withdrawals to be made in fiat currency.

13 *Id.*; *see* [Verification levels explained – Kraken (archive.org)](). The intermediate and pro levels allow

14 users access to more trading options such as futures trading and over-the-counter trading. *Id.*

15 　　All of the account types permit deposits and withdrawals to be made in cryptocurrency. *Id.* at ¶

16 25. There are no limits placed on cryptocurrency deposits for any of the account levels, but the starter

17 account level has a withdrawal limit of only $5,000 (in USD value) per 24-hour period. *Id.* The ability

18 to deposit or withdraw cryptocurrency units is one of the features of cryptocurrency that sets it apart

19 from traditional accounts holding financial investments. *Id.* at ¶ 26. How easily a cryptocurrency user

20 can move (deposit or withdraw) cryptocurrency units from one exchange platform to another one, or to a

21 personal user wallet, is part of what makes it harder for the IRS to make an initial determination whether

22 a user is in compliance with the internal revenue laws. *Id.* Unlike traditional investment accounts where

23 an account holder is buying and selling securities within that account, cryptocurrency exchanges

24

25 　　　[3] "Staking," more specifically "on-chain staking" is a process through which a user holding
certain types of cryptocurrency can participate indirectly in the validation and confirmation of
26 cryptocurrency transactions to the blockchain by "staking" their units. While staked, the user cannot sell
or withdraw the units but can earn rewards (payouts) in return for staking. *See* [Overview of On-chain
27 staking on Kraken – Kraken]().

United States' Response to
Order to Show Cause
Case No. 3:21-cv-02201-JCS 　　　　　7

1  generally permit users to deposit and withdraw the cryptocurrency units themselves, which allows users
2  to shift property among multiple accounts for profit-maximization or other reasons. *Id.* at ¶ 27.
3  Identifying the existence of other accounts owned by a user and tracing the movement of cryptocurrency
4  to those accounts makes calculating a taxpayer's gain for tax compliance purposes challenging. *Id.* at ¶
5  28.

6         The oldest information the IRS has relating to Kraken's account verification requirements is
7  from August 2019. *Id.* at ¶ 30. Based on the IRS's experience with Coinbase, cryptocurrency
8  exchanges have changed over time what information they collect for account verification. For Coinbase,
9  there was a period in which taxpayer ID information was not collected. *Id.* Kraken appears to have
10 required a taxpayer ID number for verification at the intermediate and pro account level since at least
11 August 2019 but does not require a taxpayer ID number for starter level accounts. *Id.* at ¶ 31. As
12 explained above, the IRS was largely unable to positively identify Coinbase users when a taxpayer ID
13 number was lacking from the information Coinbase initially provided. Here, the IRS would expect to
14 receive account information for an entire category of Kraken accounts where the taxpayer ID number is
15 lacking. As such, the IRS will need to rely on additional personal identity or Know-Your-Customer
16 information to connect Kraken account holders with actual taxpayers.

17     **C. The IRS's Requests Are Narrowly Tailored to Meet its Investigative Needs**

18         Generally, the IRS drafts its requests for information in a manner that ensures it will capture the
19 information it needs even when it is not clear how the summoned party categorizes or defines that
20 information. When read with the context of what information it is believed Kraken collects from its
21 users, and with the benefit of the IRS's experience with Coinbase, the IRS's requests are appropriately
22 tailored to ensure the receipt of relevant information. Even so, the IRS has revised some its requests to
23 even more narrowly identify what information it is seeking, while still trying to align those requests with
24 how it believes Kraken manages its data.

25         **1.    Request 1**

26         The IRS is seeking account registration records for each account owned or controlled by a
27 Kraken John Doe and has further identified specific categories of information that it believes may be

United States' Response to
Order to Show Cause
Case No. 3:21-cv-02201-JCS        8

13995683.1

1  collected by Kraken:  complete user profile, account application, and user preferences; history of

2  changes to the user profile; complete user history; records permitting third-party access; and complete

3  user payment methods, including any other information relating to funding sources.  The IRS is not

4  seeking private personal information such as password, pins, private keys, security settings, or account

5  recovery information.  This request is primarily intended to illicit the following necessary information

6  from Kraken:  (1) the account user's name; (2) date of birth; (3) taxpayer ID number; (4) physical

7  address; (5) email address; and (6) telephone number.

8          **a.  Complete User Profile, Account Application, and Complete User
               Preferences**

9

10         The IRS has requested the user profile, user preferences, and account application because it

11  believes that these categories include the information that is most like the four data points the Court

12  identified in *Coinbase* as basic information—that is name, date of birth, taxpayer ID number, and

13  physical address.[4]

14         Based on Kraken's account verification requirements, the IRS believes that this information will

15  also include a telephone number and email address.  The IRS needs both additional items because the

16  IRS's internal systems track taxpayer telephone numbers and email addresses when reported by

17  taxpayers.  Second Declaration at ¶ 46.  When the IRS does not receive a taxpayer ID number or the

18  account holder's name and taxpayer ID number do not initially match with the IRS's internal

19  information, it has found that other data points such as date of birth, physical address, telephone number,

20  and email address can allow the IRS to link the account information to a specific taxpayer.  *Id.* at ¶ 47

21  Generally, the IRS tries to match three specific alternative data points to positively link an account to a

22  taxpayer.  *Id.* at ¶ 48.  For that reason, reconciling multiple different pieces of identifying information

23  against the IRS's internal records is necessary when verifying an account user's identity.

24         [4] In the IRS's experience, cryptocurrency exchanges do not maintain a particular "account

25  application" document because information is generally entered by the applicant through a web-based
    portal with several data fields rather than a traditional "application" that would be completed on paper.

26  Similarly, some basic information may be bifurcated and maintained in part as "profile" information and
    in part as "preferences."  Ultimately, the IRS's request for information within these categories is

27  designed to ensure it receives the identifying information that it needs to fulfill its investigative needs no
    matter what it is called or how it is stored.

1   The IRS has learned that telephone and email information is used more frequently in the

2   cryptocurrency space than names or physical addresses. *Id.* at ¶ 49.  For example, when the IRS issues a

3   summons to Coinbase for an individual-person's information, Coinbase requests that the IRS provide it

4   with specific identifiers, including both telephone numbers and email addresses. *Id.* at ¶ 50.  Even

5   though Coinbase did not provide this information in response to the John Doe summons to it, this is the

6   exact information it uses to configure user searches in its own system.  Coinbase is also unable to search

7   its own system for an account holder using a taxpayer ID number. *Id.*  The IRS's ability to issue follow-

8   up summonses is meaningless if it cannot provide the cryptocurrency exchange with sufficient

9   information to conduct searches of their own information.

10   Internally, the IRS is also in possession of cryptocurrency platform data received from other

11   sources relating to foreign-based cryptocurrency exchanges. *Id.* at ¶ 51.  This data lacks taxpayer ID

12   numbers and instead is searched most successfully using telephone numbers, email addresses, and

13   internet protocol addresses (discussed below). *Id.*  This foreign-based cryptocurrency exchange data is

14   already in the possession of the IRS which means the IRS can use it as part of its initial analysis of

15   whether a particular individual is in compliance with the internal revenue laws, but only if the IRS

16   receives the data necessary to search this information. *Id.*

17   ### b.  History of Changes to the User Profile

18   Kraken permits its users to update their basic account information at any time. *See* Updating

19   account information – Kraken.  So, the account information that is maintained in Kraken's records when

20   Kraken responds to the summons may not reflect the name, date of birth, physical address, telephone

21   number, or email address information that the IRS has in its databases. *Id.* at ¶ 55.  The IRS needs a

22   complete list of how this information may have changed over time so that it can have a higher

23   probability of successfully linking an account holder to an individual taxpayer.

24   In addition, some taxpayers have intentionally changed their personal information over time to

25   disguise their identity.  One well-known example of this involves Ross Ulbricht, the individual behind

26   the infamous Silk Road marketplace on the dark web.  Despite a multi-agency investigation into the Silk

27   Road marketplace, the investigative team had been unable to identify the administrator of the

United States' Response to
Order to Show Cause
Case No. 3:21-cv-02201-JCS               10

13995683.1

marketplace.  Gary Alford, a Special Agent with the IRS's Criminal Investigation Division, found
Ulbricht's personal email address in a response post on a bitcoin forum relating to a post Ulbricht had
made about the Silk Road that suggested the poster had inside knowledge about the Silk Road.  Despite
Ulbricht's subsequent attempts to scrub his personal information from the internet and change his email
addresses, this particular use of his personal email remained embedded as part of the chat response and
Alford found it.  Ultimately, this proved to be a seminal lead in uncovering the true identity of the
administrator of the Silk Road and helped lead to Ulbricht's arrest and ultimate prosecution.  *See* The
Tax Sleuth Who Took Down a Drug Lord - The New York Times (nytimes.com).

Limiting the IRS's request for user profile information to a snapshot of only current information
significantly hinders the IRS's ability to connect account holder data with an actual taxpayer.  The time
period covered by the John Doe summons begins in 2016—five years ago.  Having information about
how an account holder's name, date of birth, physical address, telephone number, and email address
information has changed over the life of the account is a necessary to adequately identify a taxpayer who
may have changed that information.

### c.  Complete User History

The IRS's request for complete user history is directed at three main items—confirmed devices,
internet protocol (IP) addresses, and account activity.  The last item—account activity—is covered in
Requests 5 and 6 (now Requests 4 and 5 in the revised proposed summons).  Thus, the IRS is removing
the reference to that information as part of this request because it expects to receive the requested
information in response to Requests 5 and 6.  The IRS is also revising its request to remove the first
item—confirmed devices—because it believes that, in examinations where device-specific information
is necessary to attribute ownership or control to a particular taxpayer, the IRS should already have
sufficient other identifying information in its possession to issue Kraken a follow-up summons for that
particular taxpayer.

As for the second item—IP addresses—this information is helpful when first confirming an
account holder's identity.  IP address information shows the geographical location where a device
accesses the internet (generally through an internet service provider).  *Id.* at ¶ 60.  For example, a

1    taxpayer accessing his Kraken account from San Francisco, California will have an IP address showing

2    that the access was made from San Francisco, California.  *Id.* at ¶ 61.  The geographical location of an IP

3    address is publicly available.  *Id.* at ¶ 60.  The IRS is then able to confirm a user's identity, when the

4    user's identity is uncertain, by confirming that the account was accessed from IP address locations that

5    coincide with the taxpayer's known physical address locations.  *Id.* at ¶ 64.  But where the IP address

6    information does not match, the IRS can do additional due diligence to determine the proper account

7    owner or whether there was an incidence of identity theft.  *Id.* at ¶ 65.  Separately, as explained above,

8    the IRS is in possession of data relating to foreign cryptocurrency exchanges.  Although that data lacks

9    taxpayer ID numbers, it does include information such as telephone number, email address, and IP

10   address.  *Id.* at ¶ 66.  Matching the IP addresses for Kraken users to IP addresses and other data points in

11   the IRS's information will allow the IRS to link substantive account information from multiple sources

12   for a single individual taxpayer and make a more accurate initial determination of whether that

13   individual is in compliance with the internal revenue laws.

14                                    **d.   Records Permitting Third-Party Access**

15           Like many cryptocurrency exchanges, Kraken permits users to generate an Application

16   Programming Interface (API) key.  These keys can be used by account holders to provide direct "plug-

17   in" access to a user's account for third parties.  Kraken describes these keys as being used for trading

18   bots, third-party portfolio managers or mobile apps.  *See* [Using the Kraken API with a third party](#)

19   [service – Kraken](#).  For tax purposes, however, the IRS knows that API keys are also used as a

20   mechanism to synchronize transactional data with third-party tax software companies that specialize in

21   helping calculate taxable gains based on cryptocurrency transactions.  Second Declaration at ¶ 69.

22   Information on a user's employment of an API key to provide transactional data to a tax software

23   company is not only specific information supporting a conclusion that the user had recognized taxable

24   gain, but also suggests that the user should have known what the gain was even if it was not reported on

25   his tax returns.  The IRS can use this information to help make an initial determination of whether a user

26   was in compliance with the internal revenue laws.

27

United States' Response to
Order to Show Cause
Case No. 3:21-cv-02201-JCS                 12

1

### e.  Complete User Payment Methods

2      Kraken permits users to fund their accounts with either fiat currency or with cryptocurrency.

3 Understanding how an account was funded and where it was funded from can provide valuable insight

4 for the IRS when determining whether an individual is in compliance with the internal revenue laws.

5 The IRS has seen situations in which the gross income reported on the taxpayer's tax return does not

6 support the taxpayer's financial ability to conduct the transactions that occurred on the cryptocurrency

7 exchange.  This is more common in cryptocurrency examinations because the demographics of

8 cryptocurrency users skew towards younger taxpayers who often have non-traditional income sources.

9 Second Declaration at ¶ 76.

10      For example, in her declaration in support of the petition to serve the John Doe summons on

11 Kraken, Revenue Agent Karen Cincotta identified multiple specific examples of taxpayers who held

12 accounts at Kraken and did not appear to be in compliance with the internal revenue laws.  (Docket No.

13 1-2, ¶¶ 70-74).  Since 2017, Taxpayer 1 had been involved in more than $39 million in financial

14 transactions, but Taxpayer 1's last-filed income tax return in 2015 reported no income other than

15 minimal wage income.  *Id.* at ¶ 70.  The minimal wage income could not support the U.S.-dollar value of

16 transactions that Taxpayer 1 had engaged in.  Identifying the specific funding sources in these situations

17 is important.  Given that Taxpayer 1 was also hiding his transactions through multiple entities—that had

18 also not filed tax returns—knowing the funding sources up front enables the IRS to trace the source of

19 funds even when the taxpayer is using accounts that are not in his own name.

20      In addition, Taxpayer 4 discussed in Revenue Agent Cincotta's declaration also filed tax returns

21 reporting only minimal wage income yet engaged in transactions exceeding $5.6 million dollars.  *Id.* at

22 ¶ 73.  This reflects a disconnect between reported income and financial status.  By evaluating the

23 account holder's funding sources, such as linked accounts, the IRS can determine whether an individual

24 account user appears to be adequately reporting all their income.

25      ### 2.   Request 2

26      The IRS is seeking "any other records of Know-Your-Customer due diligence" performed by

27 Kraken on a user.  Based on Kraken's representations about what identity verification information it

collects, this category of information is limited to a user's valid ID, proof of residence, and information collected through a Know-Your-Costumer (KYC) questionnaire. Second Declaration at ¶ 73. For individuals, that questionnaire generally includes email address; tell us about yourself questions; public account ID; purpose of account; country of residence; deposit/withdrawal information; employment; net worth; source of wealth; expected trading activities. *Id.* at ¶ 74. For businesses, the questionnaire generally includes legal name; business address; country; website; contact information; industry; goods and services; government-issued business registration or tax-identification number; trading activities; and source of funds. *Id.* at ¶ 75.

The IRS does not need proof of residence information because the John Doe class is already limited to United States taxpayers. Although information contained in a user's valid ID such as a driver's license or passport number are helpful to positively identify a user through other sources, the IRS believes it can wait to obtain this information. As such, it need not obtain a copy of a user's valid ID provided to Kraken. The IRS believes that if this information becomes necessary to prove account ownership at some later date, it can issue a follow-up summons to Kraken at that time.

As for the individual KYC questionnaire, the IRS is narrowing its request to only seek the responses to the employment, net worth, and source of wealth questions. Given that the KYC questionnaire is only required for pro-level accounts, the IRS expects that these responses will only be provided for a limited number of account holders. But that limited subset of account holders have the type of account that permits the largest movement of funds as well as access to Kraken's "dark pool"—a discrete market where the order books are secret, making it easier to buy or sell larger unit volumes without influencing the market. Second Declaration at ¶ 85. Given the more-likely larger movement of funds and higher dollar values it is almost certain that these individuals will have experienced a taxable gain. Having additional information such as employment, net worth, and source of wealth will help the IRS determine whether an individual is in compliance with the internal revenue laws. Employment information can be matched against Forms W-2 issued by the identified employer to both confirm the user's identity and identify the user's income level. Net worth and source of wealth information can

1 help the IRS understand whether the identified taxpayer has a level of wealth commensurate with his

2 earnings or possibly unreported income.

3      As for the business KYC questionnaire, the IRS believes all the information obtained by the

4 questionnaire is the same basic information requested for individual users.  The IRS believes each of the

5 pieces of information identified in the questionnaire, if not already provided as part of the user identity

6 information described in Request 1, is necessary to properly identify the business taxpayer that controls

7 the account as well as the actual individuals (contacts) that have access to the account.

8     **3.**    **Request 3**

9      The IRS has historically relied heavily upon correspondence information obtained through John

10 Doe summonses when conducting investigations directed at tax non-compliance in the offshore area.

11 Because offshore tax evasion often involves an offshore entity (e.g., a corporation, trust, or foundation)

12 or multiple entities, these entities typically are controlled through nominee directors and/or trustees and

13 are used to conceal the taxpayers' beneficial ownership of offshore—and sometimes domestic—

14 accounts and assets.  Foreign corporations/offshore foundations with nominee officers and directors are

15 often used to conceal beneficial ownership.  Second Declaration at ¶ 90.  To properly examine taxpayers

16 operating offshore, the IRS needed to obtain correspondence to identify the true beneficial owner—the

17 individual who was making decisions and benefiting from the offshore funds.  *Id.*

18      Just as with offshore tax avoidance, individuals have begun using cryptocurrency as a digital

19 avenue to move money and avoid taxes because of its pseudonymous aspects.  However, because of the

20 verification requirements that Kraken has implemented, the IRS believes it can wait to obtain

21 correspondence that may be relevant to its investigation until a later time.  If the IRS receives the other

22 summoned information discussed so far, it should be able to issue a follow-up summons to Kraken for

23 the subject individual for correspondence.  So, the IRS has removed this request from the revised

24 proposed summons.

25

26

27

United States' Response to
Order to Show Cause
Case No. 3:21-cv-02201-JCS        15

13995683.1

4.    **Request 4**[5]

Because cryptocurrency exchanges are treated as money services business under Title 31 of the United States Code, they are required to implement an anti-money laundering ("AML") system.  The IRS is seeking all exception reports generated by that system and investigations of those reports.  In the IRS's experience, these reports, and the related investigations, can provide valuable insight into whether a particular user or group of users were in compliance with the internal revenue laws.  Second Declaration ¶ 93.  The IRS's review of this information has led it to identify activities such as suspicious transactions between seemingly unrelated taxpayers, and to identify additional cryptocurrency exchange accounts or personal user wallets (which can be independently searched using a public blockchain explorer to check for tax non-compliance), shared account access, or suspicious movements of funds. *Id.*

The exception reports identify questionable transactions engaged in by a user that warranted more research and investigation by the exchange.  *Id.* at ¶ 93.  Reviewing these reports allows the IRS to leverage the industry expertise of the business involved (here, a cryptocurrency exchange) about what type of activity is abnormal or suspicious and allows the IRS to combine that expertise with other information available to the IRS in order to determine whether the subject taxpayer is in compliance with the internal revenue laws.  *Id.*  As explained in Revenue Agent Cincotta's declaration, criminal activity, even when it is not strictly tax related, is generally indicative of tax non-compliance.  (Docket No. 1-2, ¶¶ 78).   Investigative information compiled by the cryptocurrency exchange often contains information provided by the user explaining the nature of the questionable activity that can help the IRS determine whether a taxpayer is in compliance with the internal revenue laws.  For example, in response to an investigation into large dollar, voluminous, or frequent transactions, a user may have provided an explanation on the source of funds or specific purpose for the activity that is reasonable and comports to what was reported by the user on his tax return.  Second Declaration at ¶ 95.  In this situation, the IRS

---

[5] With the removal of the substance of Request 3 from the revised proposed summons, Requests 4-6 from the initially proposed summons are now renumbered Requests 3-5 respectively in the revised proposed summons.

1   may be able to avoid unnecessarily examining an individual based on activity that might otherwise

2   appear questionable. *Id*.

3          The IRS is not seeking any suspicious activity reports (SAR) that may have been ultimately

4   generated because of an AML alert or any other information that would reveal a SAR.

5          **5.      Request 5**

6          The information sought in Request 5 is transactional information relating to user accounts.  The

7   IRS needs transactional information to determine whether an account holder is in compliance with the

8   internal revenue laws. *Id*. at ¶ 97.  As the Court correctly recognized in *Coinbase*, the IRS is entitled to

9   this type of information.

10                              **a.   Buy/Sell Information**

11         The IRS is seeking the purchase and sale information for the John Doe user accounts.  This

12  includes transactions where cryptocurrency units were purchased or sold for fiat currencies.  The sale of

13  cryptocurrency is a taxable disposition. *Id*. at ¶ 98.  And although the purchase of a cryptocurrency is

14  not inherently taxable, the purchase price (plus any fees paid) establishes the cost basis in that property

15  that is used to determine the amount of taxable gain generated upon the sale of that same unit. *Id*.  The

16  same is true even when cryptocurrency is exchanged for other cryptocurrency rather than fiat currency.

17  *Id*.

18                   **b.   Lending, Borrowing, and Margin Positions**

19         When a user engages in "margin" activity, that is the borrowing (or lending) of fiat currency or

20  cryptocurrency to effectuate other trading activity, those transactions may have tax implications. *Id*. at

21  ¶ 100.

22               **c.   Cryptocurrency Deposit/Withdrawal Information**

23         The IRS is seeking information relating to the deposit and withdrawal of cryptocurrency units

24  out of the user's account.  This information will show if the user was moving units of cryptocurrency

25  from other cryptocurrency platforms or from personal user wallets, which will, in turn, help the IRS

26  make a better determination of whether the user is in compliance with the internal revenue laws. *Id*. at

27  ¶ 102.  The deposit or withdrawal of units from an account may also be taxable transactions themselves.

United States' Response to
Order to Show Cause
Case No. 3:21-cv-02201-JCS                    17

1    *Id*. at ¶ 103.  The deposit (receipt) of cryptocurrency into an account may represent compensation or a

2    similar payment to the user that represents taxable income.  *Id*.  And the withdrawal (sending) of units

3    from the account may represent a taxable disposition if the units are going to a third party.  *Id*.  To

4    evaluate this information to determine proper tax characterization of the transactions and whether a user

5    is in compliance with the internal revenue laws, the IRS is seeking the date and time of the transaction,

6    cryptocurrency involved, amount of cryptocurrency involved, U.S. dollar value, transaction hash (ID),

7    and blockchain addresses for cryptocurrency units transferred into or out of the user's account from

8    another Kraken user or from outside Kraken.  *Id*. at ¶ 104.

### d.  Other Units Received

10    Finally, the IRS is seeking records relating to other taxable events that may have occurred within

11    the account.  This includes the receipt of additional units of cryptocurrency as the result of a

12    chainsplitting hard fork, which represents taxable income.  *See* Rev. Rul. 2019-24, 2019-44 I.R.B. 1004,

13    2019 WL 5090550 (Oct. 10, 2019).  Kraken permits its user to participate in "staking" which is another

14    process through which a user can earn units of cryptocurrency.  *Id*. at ¶ 105.  Finally, other situations

15    exist where a user may receive units of cryptocurrency gratuitously through promotional events.  *Id*.

16    Because all of these situations result in income to the user, the IRS needs the transactional information

17    relating to these events so it can properly determine whether a user is in compliance with the internal

18    revenue laws.  *Id*. at ¶ 106.

### 6.  **Request 6**

20    As with the transactional items in Request 5, the Court in *Coinbase* enforced in full the IRS's

21    request for transactional account information relating to the deposit and withdrawal of fiat currency from

22    the account.  As explained above in relation to funding sources, the IRS uses this information to

23    understand how a user is funding his or her purchases of cryptocurrency and where money may be sent

24    after units are sold.  *Id*. at ¶ 107.  All this information is evaluated to make the most informed decision

25    the IRS can about whether an individual is in compliance with the internal revenue laws.

### III.    CONCLUSION

27    For these reasons, the United States requests the Court not deny its petition and instead issue an

United States' Response to
Order to Show Cause
Case No. 3:21-cv-02201-JCS                 18

order granting the IRS leave to serve its revised proposed John Doe summons upon Payward Ventures, Inc. and Subsidiaries.  In the alternative, if the Court is still concerned about the scope of the revised proposed summons, the United States requests it be granted leave to further revise its requests before denial of its petition.

Dated this 14th day of April, 2021.

DAVID A. HUBBERT
Acting Assistant Attorney General

*/s/ Amy Matchison*
AMY MATCHISON
Trial Attorney, Tax Division
U.S. Department of Justice