DAVID A. HUBBERT
Acting Assistant Attorney General

AMY MATCHISON (CA Bar No. 217022)
Trial Attorney
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:    (202) 307-6422
Fax:              (202) 307-0054
E-mail: Amy.T.Matchison@usdoj.gov
             Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE TAX LIABILITIES OF: | Civil Number: 3:21-cv-02201-JCS |
| JOHN DOES, United States person(s), who directly or indirectly had authority over any combination of accounts held with Payward Ventures Inc., d/b/a Kraken or Kraken.com, or its predecessors, subsidiaries, divisions, or affiliates (collectively, "Kraken"), with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the period January 1, 2016 through December 31, 2020. | **SECOND DECLARATION OF KAREN CINCOTTA IN SUPPORT OF EX PARTE PETITION FOR LEAVE TO SERVE "JOHN DOE" SUMMONS** |

I, Karen Cincotta, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a duly commissioned Internal Revenue Agent ("Revenue Agent") assigned as a Supervisory Revenue Agent in the Internal Revenue Service's ("IRS") Offshore Compliance Initiative ("OCI"). My post of duty is in Laguna Niguel, California.

2.      The IRS is conducting an investigation to determine the identity and correct federal income tax liability of U.S. persons who conducted transactions in cryptocurrency for the years ended December 31, 2016, 2017, 2018, 2019, and 2020.

3.      This is my second declaration in support of the United States' ex parte petition for leave to serve a John Doe summons to Payward Ventures, LLC d/b/a Kraken ("Kraken"). In response to the

Court's Order to Show Cause of March 31, 2021, I will provide additional detail about the process by which the IRS examines whether a cryptocurrency user is in compliance with the internal revenue laws, what problems it has encountered as part of those examinations, including issues resulting from information received from the John Doe summons issued to Coinbase, and what specific information the IRS needs to identify Kraken users and determine whether they are in tax compliance.

4.   As stated in my prior declaration, cryptocurrency is treated as property for federal tax purposes.  When reporting gains and losses from the sale of cryptocurrency, a taxpayer may use different methods for calculating that gain or loss.  A taxpayer may use the specific identification method to pair the sale of a specific unit of cryptocurrency against a specific acquisition or the so-called "first-in-first-out" accounting method that simply pairs the sale of a unit of cryptocurrency against the oldest-acquired unit chronologically.

5.   Although these approaches provide a taxpayer with flexibility in how they calculate gains or losses on the sale of cryptocurrency units, they do not allow the IRS to make a "taxable gain" determination by simply reviewing an account holder's transaction information in isolation.  Instead, the IRS must first positively identify an account holder and then determine whether that individual filed a tax return for the relevant tax year, whether that return reported cryptocurrency transactions, and, if so, whether what was reported, or the approach taken in reporting the information, complies with the internal revenue laws.

6.   The IRS has conducted multiple examinations involving taxpayers with transactions occurring at three or more distinct cryptocurrency exchanges and, at times, upwards of ten.  Taxpayers are not required to report on their tax return which exchange certain taxable transactions occurred on.

7.   One key to determining whether there has been tax compliance is establishing, without question, the account holder's identity within the IRS's own computer systems.  This means linking a particular account holder to a particular name and taxpayer identification number within the IRS's internal databases.  This is because the IRS cannot begin an examination of a taxpayer without first positively identifying that taxpayer.  To do so, the IRS employs several methods, including matching identifying information from external sources with IRS internal sources and databases.

8.      Basic information such as name, address, date of birth, and taxpayer ID number goes a long way in establishing the identity of a taxpayer but, in my experience as a Revenue Agent, (particularly working in the offshore and electronic payments systems area and on other John Doe summonses) that information does not always go far enough.  It is not uncommon for taxpayers to use aliases, false addresses or post office boxes, fictitious entity names, or other means to disguise their true identities.  That makes basic information such as name, address, date of birth, and taxpayer ID number insufficient.  Also, that basic information is not always available because certain pieces are sometimes missing (such as date of birth where an entity name is used), incomplete, or have been falsified.

9.      In reviewing the information provided in response to the John Doe summons issued to Coinbase, the IRS ran into several problems when trying to positively identify the account holders.

10.     The information provided by Coinbase lacked taxpayer ID numbers for approximately 10% of the users (over 1,300 taxpayers).  There were also over 150 instances where the account data did not include a name and approximately 170 instances where the name was a pseudonym rather than an actual name.  There were over 500 instances where no date of birth information was provided and roughly 1,000 instances where no physical address information was provided.

11.     The IRS worked with Coinbase to attempt to obtain the missing information.  Coinbase was able to provide some of the missing information, reducing the unknown names to only a few.  Missing address information was reduced to approximately 650 instances and missing date of birth information was reduced to slightly below 500.  Coinbase was not able to provide any of the missing taxpayer ID numbers.

12.     During discussions with Coinbase, it explained that some of the account information may be missing because it had not necessarily been collected for some of the oldest accounts.  In these situations, basic identity information such as name, taxpayer ID number, date of birth, and physical address was insufficient to positively identify the actual taxpayer account holder.

13.     The failure in these instances was almost entirely because the account information provided by Coinbase lacked a taxpayer ID number.  Where there was no taxpayer ID number and other

information was also missing, it was nearly impossible for the IRS to positively identify the relevant taxpayer.

14. Since Coinbase completed its production of information to the IRS in August 2018, the IRS has spent a significant amount of time and resources to identify approximately 535 additional taxpayers from this data, but more than 750 individual taxpayers are still unknown to the IRS. The IRS continues to work on identifying additional taxpayers.

15. The transaction information with respect to the more than 750 still unidentified taxpayers reveals that those taxpayers realized more than $100,000,000 in gross proceeds from the sale of cryptocurrency during the years covered by the Coinbase John Does summons which the IRS has been unable to link to any identifiable taxpayers.

16. The Court's partial enforcement of the summons in *Coinbase* that required Coinbase provide only basic information such as name, date of birth, taxpayer ID number, and physical address, prevented the IRS from having discussions with Coinbase about what other additional identifying information it had in its records that could be used to help the IRS positively identify the unidentifiable users, like telephone numbers or email addresses. Given the relevant statute of limitations, the IRS has been evaluating what options it has to pursue these taxpayers.

17. According to its terms of service, Kraken has three account verification levels—starter, intermediate, and pro. *See* [Verification level requirements – Kraken (archive.org)](#) (11/28/2020).

18. For all three account levels, Kraken gathers the user's email address, full name, date of birth, phone number, and physical address. Kraken does not require a taxpayer ID number for the starter account level.

19. In 2021, Kraken introduced a fourth account verification level—express—that is only available in the United States. This level is between starter and intermediate.

20. For the intermediate and pro account levels, Kraken requires its users to provide a valid ID, proof of residence, and a taxpayer ID number (for U.S. residents).

21. At the pro account level, Kraken requires completion of a Know-Your-Customer questionnaire that includes for individuals: email address; tell us about yourself questions; public

account ID; purpose of account; country of residence; deposit/withdrawal information; employment; net worth; source of wealth; and expected trading activities. For businesses, the questionnaire includes: legal name; business address; country; website; contact information; industry; goods and services; government-issued business registration or tax-identification number; trading activities; and source of funds.

22. These verification levels differ in a few ways that are relevant to IRS's tax compliance investigation. However, none of the account levels place any restrictions on trading volume or value. This means that an individual with a starter account is able to trade cryptocurrency in unlimited amounts (and generate significant amounts of taxable gain) without needing to provide a taxpayer ID number.

23. All three account levels permit the user to trade on margin, although limits are placed based on account level, and all three account levels permit the user to earn additional cryptocurrency by participating in staking.

24. The primary distinction between the account levels relates to the ability to fund the account with fiat currency (i.e., U.S. dollars) or only with cryptocurrency. The starter account level does not permit any deposits or withdrawals from the account to be made in fiat currency. The intermediate and pro level accounts permit deposits and withdrawals to be made in fiat currency.

25. All the account types permit deposits and withdrawals to be made in cryptocurrency. There are no limits placed on cryptocurrency deposits for any of the account levels, but the starter account level has a withdrawal limit of only $5,000 (in USD value) per 24-hour period.

26. The ability to deposit or withdraw cryptocurrency units sets it apart from traditional accounts holding financial investments. A cryptocurrency user can easily move (by deposit or withdrawal) cryptocurrency units from one exchange platform to another one, or to a personal user wallet. As outlined below, this makes it more difficult for the IRS to make an initial determination whether a user is in compliance with the internal revenue laws.

27. Unlike traditional investment accounts where an account holder is buying and selling securities entirely within that account, cryptocurrency exchanges generally permit users to deposit and

withdraw the cryptocurrency units themselves which allows users to shift property among multiple accounts for profit-maximization or other reasons.

28. The need to identify the existence of other accounts owned by a user and to trace the movement of cryptocurrency to those accounts makes calculating a taxpayer's gain for tax compliance purposes extremely difficult. This is why the IRS is seeking information about the existence of these accounts and about such movements so that it can piece together activity and compare it to what was reported on a tax return.

29. The intermediate and pro levels allow users access to additional trading options such as futures trading and over-the-counter trading.

30. The oldest information the IRS has relating to Kraken's account verification requirements is from August 2019. Based on the IRS's experience with Coinbase, cryptocurrency exchanges have changed what information they require for account verification. For example, there was a period of time in which Coinbase did not collect taxpayer ID information.

31. Kraken has required a taxpayer ID number for verification of intermediate and pro level accounts since at least August 2019, but it is not clear when that policy was initiated. Based on the IRS's experience with Coinbase, it has concerns about potential situations where user account information cannot be adequately linked to an actual taxpayer because of missing or incorrect information—particularly the lack of a taxpayer ID number. This is why the IRS is seeking additional information beyond the "basic information" of name, date of birth, taxpayer ID number, and physical address.

32. Also, additional information helps the IRS once an identification link is made because it provides additional insight about the individual that is relevant to determine whether that individual is compliant with the internal revenue laws. For example, the IRS has investigated taxpayers engaging in cryptocurrency transactions where the reported volume of cryptocurrency trading and gains did not align with the taxpayer's sources of income needed to conduct the trades. The IRS was able to use this discrepancy to start an examination which led to the discovery that the taxpayer had unreported income from other sources that was being used to acquire the cryptocurrency.

33. As I will explain below, the IRS has narrowly tailored its proposed requests for information to Kraken. In response to the Court's concerns, I will explain more specifically what I believe the requested information to be, how the IRS anticipates using the requested information, and why the requested information is specifically directed at furthering its investigation. The IRS has also revised it proposed summons requests and those revised requests are reflected in the revised summons attachment, attached as Exhibit B.

34. Request 1 seeks account registration records for each account owned or controlled by the user. The IRS is asking for accounts owned *or* controlled by the user because it is not uncommon for individuals to disguise account ownership through a nominee or an alias.

35. If the IRS only receives the "name" listed on the account, that name may be fictitious or belong to a fictitious entity which would result in the IRS being unable to connect the nominal account name with an actual taxpayer.

36. In Coinbase, a number of the user accounts listed a pseudonym rather than actual name information or omitted a name altogether.

37. Because Kraken does not request taxpayer ID number information for starter level accounts, it is expected that Kraken users are more likely to use pseudonyms and other fictitious information than were Coinbase users.

38. The IRS's experience in investigating tax evasion and avoidance indicates that, when less identifying information is gathered, particularly a taxpayer ID number, the risk of individuals providing false or fictitious information is even greater and taxpayers who create false identities are more likely to evade their taxes. This phenomenon is similar to the increased evasion of taxes that occurs when there is a lack of information return reporting.

39. The IRS identified specific items within the account registration records that it needs: (1) complete user profile, account application, and user preferences; (2) history of changes to the user profile; (3) complete user history; (4) records permitting third-party access; and (5) complete user payment methods, including any other information relating to funding sources. The IRS is not seeking

private personal information such as password, pins, private keys, security settings, or account recovery information.

40. Based on the IRS's past experience when issuing any summons, including John Doe summonses, it has concluded that it needs to draft its requests for information in a manner that ensures it will capture the information that it needs even when it is not clear, as with Kraken, how the summoned party categorizes or defines that information. This is why the proposed summons specifically identified the five categories of information in paragraph 39.

41. The IRS has identified "user profile", "user preferences," and "account application" as three categories relied upon by entities to store or manage personal information that likely contains basic personal information about the user.

42. Cryptocurrency exchanges do not maintain a particular "account application" document because information is generally entered by the applicant through a web-based portal with a series of data fields rather than a traditional "application" that would be completed on paper. The IRS's request for information within these categories is designed to ensure it receives identifying information regardless of what it is called or how it is stored.

43. Regardless of which name is used, these categories contain the information that is most similar to the items identified by the Court in *Coinbase* as basic information—that is name, date of birth, taxpayer ID number, and physical address.

44. Based on Kraken's account verification requirements, I believe that this information will also include a telephone number and email address.

45. The IRS needs a user's telephone number and email address as they have become a more fundamental aspect of a person's identity. Kraken, itself, acknowledges this in its support articles. It only allows an email address to be associated with a single account and recommends that account holders use an email address that they will always have access to so that account access is not lost. *See* Email address change – Kraken.

46. The IRS's internal systems track taxpayer's physical addresses, telephone numbers, and email addresses when reported by taxpayers when filing their income tax returns.

47. In situations where the IRS does not receive a taxpayer ID number or the person's name and taxpayer ID number do not initially match with the IRS's internal information, additional data points such as date of birth, physical address, telephone number, and email address can assist the IRS in linking the user account information to a specific taxpayer.

48. Generally, the IRS tries to have three specific data points that match in order to positively link information to a taxpayer. Being able to reconcile multiple different pieces of identifying information against the IRS's internal records is necessary when verifying an account user's identity.

49. Based on my experience, telephone and email information is relied upon more heavily in the cryptocurrency space than names or physical addresses.

50. When the IRS issues Coinbase an individual-person summons, Coinbase requests that the IRS provide it with identifiers, including both telephone numbers and email addresses for the subject individual, so that it can use them to search its system. Coinbase has indicated that it cannot search its system using a taxpayer ID number.

51. Internally, the IRS is also in possession of cryptocurrency platform data received from other sources relating to foreign-based cryptocurrency exchanges. This data lacks a taxpayer ID number. Because of how foreign-based cryptocurrency exchanges track user information, this data is best searched using telephone numbers, email addresses, and internet protocol addresses (discussed below).

52. The IRS does not know how Kraken categorizes its information, but to clarify, the IRS is seeking the following basic account user information:

- Name;
- Taxpayer ID number;
- Date of birth;
- Physical address;
- Telephone number; and
- Email address

53. The requested information includes the same basic information approved by the Court in *Coinbase* with the addition of telephone numbers and email addresses. These two additional pieces of information are fundamental to the IRS's ability to identify taxpayers from the John Doe class.

54. Kraken permits its users to update their basic account information at any time. This includes personal identifying information such as name, date of birth, physical address, telephone number, and email address.

55. I expect that the user account information that is maintained in Kraken's records at the time Kraken responds to the summons may not reflect the name, date of birth, physical address, telephone number, or email address information that was provided when the account was created and may not match what the IRS has in its databases because the information may have been changed. The proposed summons requests a complete list of how this information may have changed to help the IRS successfully link a user's account information to an individual taxpayer.

56. The proposed summons request for complete user history is directed at three main things—confirmed devices, internet protocol (IP) addresses, and account activity.

57. The last item—account activity—is covered thoroughly in Requests 5 and 6. As such, the IRS is removing the reference to that information from this request.

58. The IRS is also revising its request to remove the first item—confirmed devices—because in examinations where device-specific information is necessary to attribute ownership or control to a particular taxpayer, the IRS will already know the specific identity of the individual the IRS is seeking to attribute ownership to and will have sufficient other identifying information in its possession to issue Kraken a follow-up summons for that particular taxpayer.

59. With respect to IP addresses—this information is helpful when initially confirming a user's identity and making an initial determination regarding whether the identified user is in tax compliance.

60. In situations where the IRS has had difficulty adequately confirming a taxpayer's identity, it has been able to employ IP address information as an additional data point to confirm that the IRS has connected information to the proper taxpayer. IP address information indicates the

geographical location where a device accesses the internet (generally through an internet service provider). The geographical location of an IP address is publicly available so the IRS can use IP address information to search publicly available records to determine a location.

61. For example, a taxpayer accessing his Kraken account from San Francisco, California will have an IP address indicating that the access was made from San Francisco, California.

62. It is my understanding that IP address information is actively being collected and monitored by cryptocurrency exchanges such as Kraken.

63. Cryptocurrency exchanges use IP address information internally to determine from where an individual is attempting to access their platform so they can block access from jurisdictions where they do not operate. It is my understanding that Kraken employs this same process to monitor and block users from jurisdictions where it does not operate such as Washington State and New York.

64. Using this information, the IRS will be able to confirm a user's identity in situations where the user's identity is not certain based on the other personal information by confirming that the account was accessed from IP address locations that coincide with the taxpayer's known physical address.

65. Conversely, where the IP address information does not match, the IRS will be able to conduct additional due diligence to determine the proper account owner or whether there was an incidence of identity theft.

66. Aside from its utility in confirming an individual's identity, the IRS will be able to use this information to make a determination regarding a user's tax compliance. The IRS is in possession of data relating to foreign cryptocurrency exchanges. That data lacks a taxpayer ID number, but does include information such as telephone number, email address, and IP address. Being able to match the IP address information of a Kraken user to IP address information (and other data points contained in the IRS's information) will permit the IRS to link substantive transactional information from multiple sources for a single individual taxpayer and make a more accurate initial determination regarding that individual's tax compliance.

67. In my experience as a Revenue Agent, it is important for the IRS to receive this information at the same time it receives the other identity information because it helps identify users and can be searched against existing data in the IRS's possession to determine whether a user is in tax compliance.

68. Like many cryptocurrency exchanges, Kraken permits users to generate an Application Programming Interface (API) key. API keys can be used by account holders to provide direct "plug-in" access to a user's account for third parties. Kraken describes these keys as being used for trading bots, third-party portfolio managers, or mobile apps.

69. For tax purposes, however, the IRS knows that API keys are used as a means through which a user can synchronize transactional data with third-party tax software designed to calculate taxable amounts relating to cryptocurrency transactions.

70. Information regarding a user's employment of an API key to provide transactional data may support a conclusion that the user had taxable transactions and also may indicate that the user should have known what the gain was (even if it was not reported on his tax return).

71. The IRS can use this information to assist it in making an initial determination whether a user was in compliance with the internal revenue laws.

72. Request 2 seeks, "any other records of Know-Your-Customer due diligence" performed by Kraken with respect to a user.

73. Based on Kraken's website it collects a user's proof of residence, valid ID, and other information collected through a Know-Your-Customer (KYC) questionnaire.

74. For individuals, that questionnaire generally includes: email address; tell us about yourself questions; public account ID; purpose of account; country of residence; deposit/withdrawal information; employment; net worth; source of wealth; and expected trading activities.

75. For businesses, the questionnaire generally includes: legal name; business address; country; website; contact information; industry; goods and services; government-issued business registration or tax-identification number; trading activities; and source of funds.

76. In my experience as a Revenue Agent, I have been involved in tax examinations where the financial status of the taxpayer is difficult to determine. This is more common in cryptocurrency examinations because users of cryptocurrency tend to be younger taxpayers that often have non-traditional income sources.

77. Kraken permits users to fund their accounts with either fiat currency or with cryptocurrency. Understanding how the user's account was funded and where it was funded from can provide valuable insight for the IRS when determining whether an individual is in compliance with the internal revenue laws.

78. In my experience, information on how a user funds their cryptocurrency account can also be used to uncover related taxpayers or nominee situations. For example, the IRS conducted examinations of multiple seemingly unrelated taxpayers. Upon receiving summons information from cryptocurrency exchanges, the IRS was able to identify cross-linked bank accounts—that is, bank accounts of one taxpayer linked to another taxpayer's cryptocurrency exchange account and vice versa. Learning this information changed how the IRS approached the separate examinations and changed how the IRS approached any tax adjustments in the examinations.

79. Knowing the source of funds when initially reviewing a taxpayer's account information can provide important insight into determining whether an individual is in tax compliance. A taxpayer with minimal reported income and numerous linked funding sources is more likely to not be in compliance with the internal revenue laws.

80. Also, a taxpayer with funding sources that are not in his own name is more likely to not be in compliance.

81. Finally, identifying alternate taxpayers through cross-linked accounts is best done at the outset. Waiting to identify such information through follow-up summonses harms the IRS's ability to examine alternate taxpayers effectively because the statutory period for assessing taxes under 26 U.S.C. § 6501(a) will have dwindled or expired by the time the IRS learns of the other taxpayers involved in the activity.

82. Although Kraken collects a user's proof of residence and valid ID as part of its KYC process, the IRS does not need proof of residence information because the John Doe class is already limited to United States taxpayers.

83. The IRS also does not need to obtain a copy of a user's valid ID provided to Kraken at this time. If this particular piece of information becomes necessary to prove account ownership at some later date, the IRS should have other sufficient identity information already so that it can issue a follow-up summons to Kraken at that time.

84. With respect to the individual KYC questionnaire, the IRS is revising its request to only seek the responses to the employment, net worth, and source of wealth questions.

85. Given that the KYC questionnaire is only required for pro level accounts, I expect that these responses will only be provided for a limited number of account holders. However, pro level account holders are permitted the largest movement of funds as well as access to Kraken's "dark pool"—a discrete market where the order books are secret, making it easier to buy or sell larger unit volumes without influencing the market.

86. Given the more-likely larger movement of funds and higher dollar values, it is almost certain that these pro level account individuals will have experienced a taxable gain. Having additional information such as employment, net worth, and source of wealth will help the IRS determine whether they are in tax compliance.

87. Employment information can be matched against Forms W-2 issued by the identified employer to both confirm the user's identity and identify the user's income level. Net worth and source of wealth questions can help the IRS understand whether the identified taxpayer has a level of wealth commensurate with his earnings or possibly unreported income.

88. With respect to the business KYC questionnaire, all of the information obtained by the questionnaire is the same basic information requested for individual users. Each of the pieces of information identified in the questionnaire, if not already provided as part of the user profile information identified in Request 1, is necessary to properly identify the business taxpayer that controls the account as well as the actual individuals (contacts) that have access to the account.

89. Original Request 3 sought all correspondence between Kraken and the user or any third party with access to the account pertaining to the account.

90. When conducting investigations directed at tax non-compliance in the offshore area, the IRS has relied heavily upon correspondence information obtained through John Doe summonses. Offshore tax evasion often involves an offshore entity (e.g., a corporation, trust, or foundation) or multiple entities. These entities typically are controlled through nominee directors and/or trustees and are used to conceal the taxpayers' beneficial ownership of offshore—and sometimes domestic—accounts and assets. Foreign corporations/offshore foundations with nominee officers and directors are often used to conceal beneficial ownership. In this area, the IRS used correspondence information to positively identify the true beneficial owner—the individual that was actually making decisions and benefiting from the offshore funds. Other, more basic, identifying information such as names, addresses, and telephone numbers were of little use because they represented nominee information intentionally created to avoid detection by taxing authorities, including the IRS.

91. Correspondence information is important, but because of the verification requirements that Kraken has implemented, the IRS can wait to issue follow-up summonses to obtain this information.

92. Request 3 (originally Request 4) seeks all exception reports produced by Kraken's anti-money laundering (AML) system and all records of investigation of such exceptions.

93. Exceptions reports identify questionable transactions engaged in by a user that warranted additional research and investigation by the money services business. Based on my experience, reviewing these reports allows the IRS to leverage the industry expertise of the business involved (here, a cryptocurrency exchange) regarding what type of activity is abnormal or suspicious and allows the IRS to combine that expertise with other information available to the IRS in order to determine whether the subject taxpayer is in compliance with the internal revenue laws.

94. Moreover, investigative information compiled by the cryptocurrency exchange as part of its review of the AML exception report often contains information provided by the user explaining the nature of the questionable activity. That information can also assist the IRS in determining whether a taxpayer is in compliance.

95. For example, in response to an investigation regarding large dollar, voluminous, or frequent transactions, a user may have provided an explanation regarding the source of funds or specific purpose for the activity that is reasonable and comports to what was reported by the user on his tax return. In this situation, they IRS may be able to avoid unnecessarily examining an individual based on questionable activity.

96. Request 4 (originally Request 5) seeks all records of activity in the user's account.

97. Based on my review of the type of activity permitted on Kraken's platform, I anticipate Kraken having the following transactional information that is necessary to determine whether a user is compliant with the internal revenue laws.

98. The IRS needs purchase and sale information for the subject user accounts. This includes transactions where cryptocurrency units were purchased or sold for fiat currencies or exchanged for other cryptocurrencies. The sale of cryptocurrency for cash or exchange of cryptocurrency for other cryptocurrency is a taxable disposition. The purchase of cryptocurrency is not inherently taxable, but the purchase price (plus any fees paid) establishes the cost basis in that property, which is used to determine the amount of taxable gain generated upon the sale of that same unit. The same is also true in situations where cryptocurrency is exchanged for other cryptocurrency rather than fiat currency.

99. These types of transactions are reportable on an individual's income tax return and relate directly to an individual's proper tax reporting.

100. Where a user engages in "margin" activity, that is the borrowing (or lending) of fiat currency or cryptocurrency to effectuate other trading activity, those transactions have tax implications.

101. The IRS needs information relating to the deposit and withdrawal of cryptocurrency units out of the user's account.

102. The existence of deposits and withdrawals of cryptocurrency is a clear indicator that the user is holding cryptocurrency in other places such as other cryptocurrency platforms or personal user wallets. The IRS needs to know this information to identify what other places the user is holding cryptocurrency so it can gather as much information as possible to make a determination regarding the user's tax compliance.

103. Additionally, the deposit or withdrawal of units from an account may be taxable transactions themselves. The deposit (receipt) of cryptocurrency into an account may represent compensation or a similar payment to the user that represents taxable income. Conversely, the withdrawal (sending) of units from the account may represent a taxable disposition if the units are going to a third-party.

104. In order to evaluate this information to determine the proper tax characterization of the transactions and whether a user is in tax compliance, the IRS needs this transactional information, including the date and time of the transaction, cryptocurrency involved, amount of cryptocurrency involved, U.S. dollar value, transaction hash (ID), and blockchain addresses.

105. The IRS needs records relating to other taxable events that may have occurred within the account. This includes the receipt of additional units of cryptocurrency as the result of a chainsplitting hard fork, which represents taxable income, staking, or other situations where a user may receive units of cryptocurrency gratuitously through promotional events.

106. Because all of these situations result in taxable income to the user, the IRS needs the transactional information relating to these events so it can properly determine whether a user is in tax compliance.

107. Request 5 (originally Request 6) seeks all records of account funding relating to the deposit, withdrawal, or transfer of fiat currency. The IRS uses this information to understand how a user is funding his or her purchases of cryptocurrency and where money may be getting sent after units are sold. This information is evaluated against other information in the IRS's possession and reported on the user's tax returns to make the most-informed decision the IRS can on whether an individual is in compliance with the internal revenue laws.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 14th day of April 2021, in Laguna Niguel, California.

_____
KAREN CINCOTTA
Supervisory Internal Revenue Agent

Internal Revenue Service